1
2
3
4
5
6

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

7

KATHRYN A. NIEMEYER,                    2:09-CV-2091 JCM (PAL)

8              Plaintiff,

9      v.

10     FORD MOTOR COMPANY, et al.,

11              Defendants.

12

13                              **ORDER**

14          Presently before the court are the parties' various motions *in limine*, filed in anticipation of

15  trial.  Specifically, defendant Ford Motor Company ("Ford") has filed six motions in limine (docs.

16  #107-112), to which plaintiffs have responded (docs. #123-128).  Additionally, plaintiffs have filed

17  a motion to strike (doc. #113), as well as an omnibus motion containing 14 separate motions *in*

18  *limine* (doc. #114).  Ford has responded to the motion to strike, as well as the motions *in limine*

19  (docs. #131-145).

20          In light of the advanced nature of these proceedings, and the case's close proximity to trial,

21  the court is confident that all interested parties are sufficiently versed in the factual and procedural

22  background of the case.  Accordingly, the court finds it more efficient and beneficial to move directly

23  to a discussion of this bevy of motions, and provide factual or procedural background within the

24  context of each individual motion, to the extent required by the court's analysis.

25  . . .

26  . . .

27  . . .

28

**James C. Mahan**
**U.S. District Judge**

1    A.    Defendant's Motions in Limine

2         **1.    Defendant's Motion in Limine No. 1 – Motion to Exclude Evidence or**

3              **Testimony Regarding Cause of Loss of Control of the Ford Focus (Doc. #107)**

4         The genesis of this fatal accident occurred when the Ford Focus Mr. Neimeyer, the decedent,

5    was driving suddenly veered to the left, continued over a raised center median, crossed two lanes of

6    oncoming traffic, proceeded up a curb, and finally crashed into a tree.  Throughout this path, no

7    corrective steering was employed and the brakes were never applied.

8         Ford represents that none of plaintiffs' expert witnesses have disclosed an opinion regarding

9    the cause of Mr. Niemeyer's initial loss of control of the vehicle.  What is more, during depositions,

10   each expert was specifically asked whether they held any such opinion, and each answered that they

11   did not.  The only person to divine a cause for the sudden veering is the decedent's wife, Ms.

12   Niemeyer.  She believes that Mr. Niemeyer experienced a sudden sneezing fit, stating "I think he was

13   pulling his handkerchief out and sneezing and with the distraction lost control of the car."  Ms.

14   Niemeyer was not present at the accident.

15        Ford's position is that Mr. Niemeyer suffered a fatal cardiac arrhythmia.

16        Plaintiffs have largely conceded the motion.  They agree that they have no direct evidence

17   regarding the cause of the loss of control and have represented that they will not attempt to introduce

18   any evidence of why the accident occurred.  Plaintiffs have reserved, however, the right to cross-

19   examine witnesses regarding the subject and make arguments regarding the cause of death during

20   closing arguments.

21        In light of plaintiffs' response to the motion *in limine* the court finds it appropriate to DENY

22   the motion as moot.  While no direct evidence of cause of death exists, plaintiffs are free to argue

23   how circumstantial evidence supports their theory.  Ford has not yet shown how any such evidence

24   is inadmissible or how any argument based on the evidence is improper.

25        **2.    Defendant's Motion in Limine No. 2 – Motion to Issue Sanctions for Spoliation**

26              **of Subject Automobile (Doc. #108)**

27   Plaintiffs' claims are premised on the theory that the vehicle's airbag system was defective,

28

**James C. Mahan**
**U.S. District Judge**

thereby failing to deploy and causing Mr. Niemeyer's head to strike the steering wheel with sufficient force to cause his death.  Ford disputes this theory, arguing that Mr. Niemeyer's head likely grazed the steering wheel at most, before striking the wiper stalk.  Ford argues the speed of the vehicle was too minimal to deploy the airbag system.

Ford previously sought to dismiss all the claims against it, arguing that Ms. Niemeyer destroyed the subject vehicle prior to Ford having the opportunity to inspect it.  The court denied the motion without prejudice, holding that, while there was no bad faith to support dismissal of Ms. Niemeyer's claims, an adverse inference instruction or rebuttable presumption may be an appropriate sanction for the spoliation.  Ford has now re-filed the motion, seeking either an adverse inference instruction or rebuttable presumption.

The basic debate is whether Mr. Niemeyer's head struck the steering wheel (as plaintiffs contend) or the wiper stalk or gear shift lever (as Ford contends).  Pictures of all three instruments remain.  Plaintiffs contend that because: (1) both biomechanical experts agree that photographs of the steering wheel do not indicate any deformation; (2) both parties agree that Mr. Niemeyer's face made contact with the wiper stalk, causing it to break; and (3) pictures indicate that the gear shift lever was placed in park, there is no additional evidence Ford could glean from a physical inspection.

"A court may instruct the jury that it may draw an adverse inference against a party or witness responsible for the destruction or spoliation of evidence."  *Morford v. Wal-Mart Stores, Inc.*, 2011 WL 635220 (D. Nev. 2011) (citing *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993)).  While sanctions are generally imposed on the party that has ultimate control, logic dictates that this is because the party that owns or controls evidence is also usually responsible for its destruction.  Here, however, Ms. Niemeyer instructed Hertz to lift the legal hold after she conducted her investigation, but before initiating litigation.  As such, it is Ms. Niemeyer, and not Hertz, that is responsible.

Further, while Ford has an opportunity to study the photographs of the vehicle, not being able to physically inspect the vehicle is prejudicial.  Pictures of the steering wheel may show a lack of deformation.  They cannot show, however, witness marks such as hair, skin, blood, or other fibers that could indicate a collision (or lack of collision) with the steering wheel.  The same holds true for

**James C. Mahan**
**U.S. District Judge**

- 3 -

1   the wiper stalk and gear shift lever.

2       Plaintiffs' argument regarding the gear shift lever is especially specious.  Plaintiffs argue that

3   the emergency response team placed the car in park.  By doing so, plaintiffs argue, any blood or skin

4   would have been removed from the gear shift lever.  It is hard to imagine that the simple act of

5   placing a car into park would wipe any and all traces of DNA material off of the gear selector.

6   Further, the duty to preserve evidence exists, at least in part, to prevent a court's need to engage in

7   such counterfactual analyses in the first instance.

8       Accordingly, the court finds it appropriate to GRANT the motion and issue a rebuttable

9   presumption instruction.  Ford shall prepare an appropriate instruction for this court's review and

10   file it no later than October 1, 2012.  Plaintiffs are also granted leave to comment on the proposed

11   instruction.  Any such comment shall be filed no later than 10 days after Ford files its proposed

12   instruction.

13       **3.**    **Defendant's Motion in Limine No. 3 – Motion to Exclude Evidence of Other**

14           **Accidents, Incidents, Complaints, or Lawsuits (Doc. #109)**

15   Plaintiffs do not oppose the granting of this motion, it is therefore GRANTED.

16       **4.**    **Defendant's Motion in Limine No. 4 – Motion to Exclude Cause of Death**

17           **Opinions by Dr. Frank Pape (Doc. #110)**

18   Plaintiffs do not oppose the granting of this motion, it is therefore GRANTED.

19       **5.**    **Defendant's Motion in Limine No. 5 – Motion to Limit Expert Testimony**

20           **Regarding "True" Airbag Deployment Rates by Christopher Caruso (Doc.**

21           **#111)**

22       Ford's documentation, and plaintiff's airbag expert, Christopher Caruso, agree that the airbag

23   sensor fitted to the Ford Focus was set to deploy the airbags in any accident occurring over 14.7 mph.

24   The sensor, however, was calibrated for an "offset pole impact."  This means that it was calibrated

25   to ignite at a 14.7 mph collision caused by a pole or other frontal impact on the left side of the front

26   bumper.  The sensor, however, was placed in the center of the front bumper.

27   . . .

28

**James C. Mahan**
**U.S. District Judge**

During his deposition, Caruso opined that centrally placed sensors ignite at lower speeds when confronted with head-on collisions.  In laymen's terms, if it takes a 14.7 mph *offset* impact to trip a sensor, it will take a lower *direct* impact to trip the same sensor.  Plaintiff's expert estimated that an 11 or 12 mph direct impact would have been sufficient to cause the airbag sensor to deploy. Mr. Niemeyer's car was apparently traveling at 14.5 mph, just below the offset threshold, but higher than Caruso's estimation.

Ford seeks to exclude Caruso's estimate and opinion regarding direct impact deployments pursuant to Fed. R. Evid. 702 and *Daubert*, arguing that there is no methodology or scientific foundation supporting the opinion.  Plaintiffs oppose the motion, arguing that basic physics and common sense support Caruso's opinion, as well as his 21 years of experience designing airbag systems for car manufacturers.

Federal Rule of Evidence 702 allows for the admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "assist the trier of fact to understand the evidence or to determine a fact in issue."  The Supreme Court has explained that an expert's opinion must be "more than a subjective belief or unsupported speculation."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993).

Expert testimony is reliable if it is "based upon sufficient facts or data," "the product of reliable principles and methods," and the expert "applies the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.  In *Daubert*, the United States Supreme Court set forth a non-exhaustive list of factors that may guide a court in assessing the reliability of offered testimony:

> (1) whether a scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the techniques operation; and (4) whether the technique is generally accepted.

*Daubert*, 509 U.S. at 593-94.

However, depending on the type of expert testimony offered, these factors may not be appropriate to assess reliability. *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir.

2006) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)).  The *Daubert* factors may have little application to expert testimony based on personal knowledge or experience.  *Id.*  In such circumstances, the trial court should not apply the *Daubert* factors in an unduly restrictive manner.  *Id.*

While plaintiffs contend that Ford failed to ask Caruso about the methodology he used to support his opinions regarding direct impact collisions, the deposition transcripts reflect otherwise. The following exchange indicates that Caruso did not disclose to Ford any methodology supporting his opinions when directly asked about the issue during his deposition:

> Q.    And walk me through all the work you did, Mr. Caruso, to depart from what's in your report and state that a center pole hit you'd have a deployment threshold at 11 to 12.
>
> A.    Again, just the fact that the dynamics of the design.  It's based purely on experience of the dynamics of the design.
>
> . . .
>
> Q.    What I'm trying to figure out is: What work have you done to come up with your new opinion that the effective deployment threshold in the center pole hit for a belted occupant is 11 to 12?
>
> A.    Well, its an estimate based on, you know, 21 years of designing these systems for other OEMs.

Caruso Dep. 261:9-15 and 264:1-8; *see also* 259:22-260:25 (indicating that Caruso could not point to any documentation corroborating the estimate) *and* 262:24-263:3 (confirming that Caruso did not conduct any testing or experimentation to confirm his estimate).

As is clear from the deposition transcript, Caruso relies solely on his experience in supporting his estimate.  In *Sandoval-Mendoza*, the Ninth Circuit instructed district courts not to apply an overly-rigid reliability approach to such opinions.  *See* 472 F.3d at 655.  However, in *Sandoval-Mendoza*, the Ninth Circuit was confronted with a medical expert's opinion, which the court specifically distinguished from that of a scientist or engineer.  The court explained, "because medical expert opinion testimony 'is based on specialized as distinguished from scientific knowledge, the *Daubert* factors are not intended to be exhaustive or unduly restrictive.'" *Id.*  The court went on to conclude that medical expert testimony should be admitted if physicians would accept it as useful

and reliable. *Id.*

Here, however, Caruso is an engineer. His knowledge is properly considered scientific. His estimates, therefore, should be supported by some objective basis. *See Neal-Lomax v. Las Vegas Metro. Police Dept.*, 574 F. Supp. 2d 1193, 1204 (D. Nev. 2008) ("The *Daubert* factors for determining reliability are not particularly relevant to determining the reliability of Woodard's opinions because his opinions are based largely on his experience, training, and education, not on scientific experiments he has performed. However, his opinions must have some objective medical or scientific basis to which he may apply the facts of this case."). There is no such objective basis to support Caruso's 11-12mph estimate. Plaintiffs have pointed to no peer-reviewed study, experiment, authoritative text or other objective source supporting the 11-12mph range, and thus the court finds it unreliable. *Id.*

Caruso may, of course, testify as to his experience regarding airbag sensors and explain the general principals regarding direct collisions and offset pole impact collisions. Any such testimony can be effectively addressed by Ford via cross-examination.

Accordingly, the motion is GRANTED in part and DENIED in part, consistent with the forgoing.

**6.      Defendant's Motion in Limine No. 6 – Motion to Exclude Any Claim that the Automobile's Steering Wheel was Damaged and/or Replaced (Doc. #112)**

Plaintiffs do not oppose the granting of this motion, it is therefore GRANTED.

B.      Plaintiffs' Motion to Strike (Doc. #113)

Plaintiffs have moved to strike the testimony of Ford's cause of death expert, Dr. Thomas Bennett, arguing that it fails to satisfy the requirements of Rule 702 and *Daubert*. Dr. Bennet will testify that Mr. Niemeyer died due to cardiac arrhythmia, not from a head injury. Plaintiffs assert that Dr. Bennett failed to properly consider the conclusions of five physicians, as well as the cause of death contained in the death certificate, all of which concur that Mr. Niemeyer died of head trauma. Plaintiffs further contend that Dr. Bennett's conclusion is not based on anatomic evidence, was produced purely for purposes of litigation, is not supported by any medical literature, and runs

James C. Mahan
U.S. District Judge

- 7 -

counter to evidence attesting to Mr. Niemeyer's cardiac health.

As previously explained, the admissibility of expert testimony hinges on the four requirements of Rule 702.  Thus, the witness must: (1) have "scientific, technical, or other specialized knowledge" that will assist the trier of fact; (2) base his testimony "on sufficient facts or data; (3) ensure the testimony is "the product of reliable principles and methods; and (4) have "reliably applied the principles and methods to the facts of [this] case." Fed. R. Evid. 702(a)-(d). "It is the proponent of the expert who has the burden of proving admissibility." *Lust By & Through Lust v. Merrell Dow Pharmaceuticals, Inc.,* 89 F.3d 594, 598 (9th Cir.1996)).

Plaintiffs' primary contention is that Dr. Bennett's testimony is not based on sufficient data and that it is not the product of reliable methods. *Id.*

Dr. Bennett's has based his conclusion, in great part, on:

> "[t]he timeframe, where [Mr. Niemeyer] was without pulse, without respiration, minutes after this event; the degree of diffuse axonal injury is not severe.  Dr. Case's own testimony, microscopic slides, autopsy report, and the literature [presented at Dr. Bennett's deposition] all support that this is not grade 2 or grade 3, the severe, lethal forms . . . of diffuse axonal injury. This is mild at best. People with mild diffuse axonal injury don't die this way . . . without the lethal cardiac arrhythmia being part of it."

Deposition of Dr. Thomas Bennett at 79:10-23 (April 11, 2011).

Ultimately, Dr. Bennett's conclusion is not the product of observing conditions that unequivocally indicate that Mr. Niemeyer died of lethal cardiac arrhythmia.  Rather, Dr. Bennett's opinion is the product of differential diagnosis (a process of elimination approach), which has been accepted as A scientifically valid methodology. *See Morin v. U.S.*, 244 Fed.Appx. 142, 143 (9th Cir. 2007) ("differential diagnosis is generally accepted as a scientifically valid methodology supporting admissible testimony under *Daubert*").

In *Morin*, the Ninth Circuit found that the district court had not abused its discretion by disqualifying the testimony of an expert witness where the witness had not shown "whether or how he applied differential diagnosis in determining the cause of Morin's plasmacytoma." *Id.* at 143–44. Here, Dr. Bennett has alleged that he has applied differential diagnosis, and has explained that he arrived at his conclusion of cardiac arrhythmia as the result of ruling out other possible causes of

James C. Mahan
U.S. District Judge

- 8 -

1   death, including plaintiffs' assertion that Mr. Niemeyer died of head trauma.

2   Here, plaintiffs' own experts have declined to rule out cardiac arrhythmia.  *See* Case Dep.

3   at 118:20-119:4; Olson Dep. at 73:16-20; Khan Dep. at 32:15-25).  Furthermore, at least one of

4   plaintiffs' experts, Dr. Case, bases his conclusion as to the cause of death on circumstantial

5   indicators (similar to the methodology of Dr. Bennett), rather than directly concluding the cause of

6   death.  *See* Case Dep. at 160:5-25.

7   While it may be the case that Dr. Bennett's testimony is far outweighed by the testimony of

8   other medical professionals involved in the case, such issues are for the jury to decide, and beyond

9   this court's limited "gatekeeping" function.  *Daubert*, 509 U.S. at 597 (emphasizing the

10   "gatekeeping" function of the courts in evaluating the admissibility of expert testimony).  Here, Dr.

11   Bennett has met the requirements of Rule 702 and *Daubert* and may testify.  Whether his opinion

12   will carry much weight in light of the counter-evidence in opposition is for the jury, not the court,

13   to decide.

14   Accordingly, the court DENIES the motion to strike Dr. Bennett's testimony.

15   C.   Plaintiffs' Motions *in Limine* (Doc. #114)

16   **1.   Plaintiffs' Motion in Limine No. 1 – Motion to Exclude Evidence of Settlement**

17   **with Defendant Hertz and Dismissals of Remaining Defendants**

18   Plaintiffs seek to exclude any evidence "of the fact and amount of plaintiffs' prior settlement

19   with Hertz Rent-a-Car ("Hertz"), that Hertz was a defendant, the dismissals of Defendants Autoliv

20   ASP Incorporated ("Autoliv") and Morton International ("Morton") as well as the amount of

21   insurance payment by CIGNA Group Insurance."  Mot. 3:7-10.  The motion is brought pursuant to

22   Fed. R. Evid 408 (prohibiting evidence of compromise, offers, and negotiations) and the collateral

23   source rule.

24   Ford does not oppose the motion in so far as it only seeks to exclude *the amount* of payment

25   from CIGNA and not the fact that CIGNA provided insurance.  Ford does, however, expect to

26   introduce evidence from the private autopsy conducted in response to CIGNA's original denial of

27   benefits, and thus expects the fact of insurance to arise at trial.

28

**James C. Mahan**
**U.S. District Judge**

- 9 -

1       Due to plaintiffs' citation to the collateral source rule as the reason for seeking to exclude the

2  CIGNA evidence, and the fact that their motion only seeks to exclude the *amount* of payment by

3  CIGNA, the motion is DENIED as moot in light of Ford's response.

4       **2.**    **Plaintiffs' Motion in Limine No. 2 – Motion to Exclude any Mention of**

5                  **Plaintiffs' Prior Counsel**

6       Prior to retaining their current counsel, plaintiffs were represented by Matthew Sauter and

7  the law firm Sauter Sullivan, LLC.  Plaintiffs contend that because Mr. Sauter had no contact with

8  Ford, was discharged prior to the suit being filed, never entered any appearance in this case, and has

9  not been involved in this matter for nearly four years, any reference to him and his firm is "irrelevant,

10  likely to cause confusion, and will potentially mislead the jury."  Mot. 5:7.

11       Ford contends that because Mr. Sauter represented plaintiffs at the time of the initial

12  investigation of the crash and at the time Ms. Niemeyer instructed Hertz to lift the legal hold and

13  dispose of the vehicle, his involvement in this matter is relevant.  Specifically, Ford contends that

14  "the fact that Katheryn Niemeyer was represented by counsel at the time she instructed Hertz to

15  release the legal hold on the Ford Focus is relevant and admissible to show that Niemeyer was

16  making these decisions with the assistance of her attorney."  Resp. 2:14-16.

17       The court finds it appropriate to DENY the motion.  Plaintiff has cited to no rule of evidence

18  or case law regarding the admissibility of Ms. Niemeyer's former counsel.  Rather, the motion

19  appears solely related to the relevance of Mr. Sauter's previous involvement in this case.  *See* Mot.

20  5:22-23 ("Any reference to Mr. Sauter in this case is unnecessary and irrelevant to either party's

21  case.").  As identified by Ford, the fact that Ms. Niemeyer was represented by counsel at the time

22  she instructed Hertz to lift the legal hold is directly relevant to the spoliation issue and provides

23  context for whatever instruction regarding spoliation the court ultimately gives.

24       As the court does not find any other relevant reason for mentioning Ms. Niemeyer's former

25  counsel, the court will issue a limiting instruction regarding any statements or evidence of Mr.

26  Sauter's involvement in this case.  Plaintiffs are instructed to file a proposed limiting instruction for

27  the court's review no later than October 1, 2012.  Any comment or objection shall be filed no later

28

**James C. Mahan**
**U.S. District Judge**

- 10 -

than ten days after the limiting instruction is filed.

3.     **Plaintiffs' Motion in Limine No. 3 – Exclusion of Plaintiffs' Previous Accident Reconstruction Expert Brian Jones**

Plaintiffs seek to exclude any "expert" testimony by Brian Jones, including any reference to his retention by plaintiffs.  Brian Jones was hired by plaintiffs to conduct an initial inspection of the vehicle and share his thoughts with Sauter regarding the performance of the airbag and safety restraint system.  While he never finalized his opinions, and only conducted what appears to be a very cursory and initial investigation, his opinion appears to have been consistent with a finding that the safety systems worked as designed.

Neither party has designated Mr. Jones as an expert.  Mr. Jones has not drafted a Rule 26 expert report.  As such, it is inappropriate to allow Mr. Jones to provide any expert opinion.  Ford does not contest such a holding and represents that it only seeks to elicit testimony, consistent with Fed. R. Evid. 701, concerning Mr. Jones's factual, first hand knowledge of his inspection of the vehicle.

Ford does note, however, that plaintiffs' motion is captioned as a motion seeking to also "exclude . . . reference to [Jones's] retention by plaintiffs."  While the title of the motion requests such an order, the body of the motion makes no argument as to why defendants should be precluded from referencing Jones's retention by plaintiffs.  Indeed, such an explanation will provide evidentiary context to who Jones is and why he was involved in the investigation.  Furthermore, the fact that plaintiff hired Jones is not unfairly prejudicial in light of the fact that Jones will not be offering any expert opinion regarding the performance of the safety restraint system.

Accordingly, the court GRANTS the motion insofar as it seeks an order declaring that Brian Jones is not an expert and may not deliver any expert opinions.  However, to the extent Mr. Jones has probative evidence as a percipient witness, he may so testify.  Further, there appears no need to exclude reference to the fact that plaintiffs initially retained Mr. Jones.

. . .

. . .

**James C. Mahan**
**U.S. District Judge**

- 11 -

1      **4.**     **Plaintiffs' Motion in Limine No. 4 – Motion to Exclude Medical Opinions of**

2                 **Unqualified Lay Witnesses**

3      Plaintiffs point to the depositions of emergency response personnel and eyewitnesses in

4 support of the assertion that Mr. Niemeyer suddenly slumped or jerked over to the right while driving

5 the vehicle, allowing his car to travel into oncoming traffic and ultimately into a tree.  The

6 emergency medical personnel stated during depositions that they based their initial medical treatment

7 on the observations and statements of eyewitnesses.  These observations and statements led the first

8 responders to believe that Mr. Niemeyer had experienced a medical (as opposed to traumatic) heart

9 attack (i.e. the heart attack precipitated the car accident, as opposed to being caused by the accident).

10 Plaintiffs argue that such evidence is opinion evidence pursuant to Fed. R. Evid. 701.

11      Rule 701 allows lay witness opinion testimony where it is "(a) rationally based on the

12 perception of the witness; (b) helpful to a clear understanding of the witness' testimony or the

13 determination of a fact in issue, and (c) not based on scientific, technical, or other specialized

14 knowledge within the scope of Rule 702."  The Ninth Circuit has allowed lay opinion testimony that

15 borders medical testimony.

16      In *United States v. Rodriguez-Rangel*, 344 Fed. Appx. 410 (9th Cir. 2009), the court found

17 that a trial court did not plainly err in admitting testimony from law enforcement officers that they

18 had "previously observed people having seizures and that Rodriguez-Rangel's behavior was

19 inconsistent with their previous observations."  *Id.* at 411.  The court found that the opinions,

20 consistent with Rule 701, were "rationally based on the perfection of the witness[es]" and "helpful

21 to a clear understanding of the witness[es]' testimony or the determination of a fact in issue."  *Id.*

22      Despite the holding in *Rodriguez-Rangel*, this court finds it appropriate to GRANT the

23 motion.  First, *Rodriguez-Rangel* is not directly on point.  There, the Ninth Circuit employed the

24 highly deferential "plain error" standard.  Thus, while it upheld the district court's ruling, it is not

25 clear that it did so because the ruling was correct, only because the ruling was not clearly wrong.

26 More importantly, in *Rodriguez-Rangel* the witnesses were comparing observations of the defendant

27 with their personal knowledge regarding seizures.

28

**James C. Mahan**
**U.S. District Judge**

Here, neither party has identified testimony that any of these witnesses have ever observed an individual having a heart attack.  As such, there is no foundation for a lay opinion that Mr. Niemeyer suffered a heart attack, such that there was foundation in *Rodriguez-Rangel* that the defendant did not suffer a seizure.  The conclusion that a heart attack occurred is properly based on perceptions, as well as education, training, and experience.  Such testimony falls within the province of Rule 702, requiring an expert opinion.  As explained by the Ninth Circuit, "the mere percipience of a witness to the facts on which he wishes to tender an opinion does not trump Rule 702." *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997) (holding that opinions were based on specialized knowledge within the meaning of Rule 702 because they were "properly characterized as testimony based on the perceptions, education, training, and experience of the witness."); *Jerden v. Amstutz*, 430 F.3d 1231, 1239 (9th Cir. 2005) (same).

While these witnesses may testify as to the facts of what they observed, there is no basis to allow them to delve further and provide an opinion as to why Mr. Niemeyer slumped to the right.  There is no evidence that these witnesses have any experience with heart attacks, *see Rodriguez-Rangel* 344 Fed. Appx. at 411, or any expertise to qualify as an expert pursuant to Rule 702, *see Figueroa-Lopez*, 125 F.3d at 1246.  The motion is GRANTED.

**5.      Plaintiffs' Motion in Limine No. 5 – Motion Seeking Exclusion of Evidence or Argument Referencing Spoliation**

This motion merely represents the opposite side of the coin identified by Ford's motion in limine number 2.  Based on the discussion and resolution of the spoliation issue contained above, the motion is DENIED.

**6.      Plaintiffs' Motion in Limine No. 6 – Motion Seeking Exclusion of Any Reference to Abandoned or Amended Pleadings**

Ford does not oppose the granting of this motion, it is therefore GRANTED.

. . .

. . .

. . .

**James C. Mahan**
**U.S. District Judge**

- 13 -

7.     **Plaintiffs' Motion in Limine No. 7 – Motion to Exclude Evidence of the Vehicle's Compliance with the Federal Motor Vehicle Safety Standards or Industry Custom and Practice**

Plaintiffs seek to exclude any evidence proffered by Ford regarding the Focus's compliance with federal safety standard FMVSS 208 or compliance with industry custom and practice in the design and testing of airbag systems.  Plaintiffs contend that any such evidence has no role in the instant case because plaintiffs' claims sound in strict liability.  Plaintiffs cite to *Robinson v. G.G.C., Inc.*, 107 Nev. 135 (1991), for the proposition that a manufacturer's level of care is "completely irrelevant to the decision [of] whether a product is defective."  Mot. 15:17-18.

The court disagrees with plaintiffs' interpretation of *Robinson*.  In *Robinson*, the Nevada Supreme Court held that in strict liability product defect cases:  (1) warnings on defective products shield the manufacturer from liability unless the defect could have been avoided by commercially feasible design changes; (2) evidence of prior and subsequent accidents with analogous machines, alternative designs, and subsequent remedial measures was admissible; and, most importantly for present purposes, (3) safety standards promulgated by the American National Standards Institute ("ANSI") were admissible.  *See Robinson*, 107 Nev. at 144.

In *Robinson*, plaintiff was operating a hydraulic crushing machine (also known as a baler) to flatten cardboard boxes.  While operating the device, he observed an object caught in the receptacle and reached in to retrieve the item.  As he was pulling to free the item, he lost his balance, was knocked forward, and found his hand caught in the machine.  His hand was badly damaged. *Id.* at 137.  The baler had been designed with a screen to prevent such accidents, but the plaintiff had disabled the screen via a toggle switch.  *Id.*

Plaintiff filed suit alleging the machine was defective because: (1) it should not have been functional without the safety screen in place, and (2) the safety screen jutted out making it susceptible to damage or detachment.  The jury found in favor of the manufacturer.  *Id.*  Plaintiff appealed, arguing, among other things, that the trial court should not have excluded evidence of new safety standards for balers promulgated by ANSI or evidence regarding safety standards common

James C. Mahan
U.S. District Judge

- 14 -

in the industry.  *Id.* at 142.  The evidence had been excluded from trial because the standards were created *after* the manufacturer of the specific baler at issue, and post-manufacture standards "did not reflect the state of the art at the] time" of manufacture."  *Id.*

The Supreme Court reversed the trial court.  It reasoned that "legislative or administrative regulatory standards are admissible as evidence of a product's safety."  *Id.* (citations omitted).  Even though the specific standards at issue in *Robinson* were created *after* the baler was manufactured, the manufacturer was free to "offer evidence of the relevant dates, and thereby give the jury full knowledge of the surrounding circumstances."  *Id.*  Further, the court explained that post-manufacture industry standards were also admissible, as they establish "circumstantial evidence that alternative courses of conduct may have been available to an entire industry."  *Id.*  As concluded by the Supreme Court, "the best way to determine if a defendant should have built a safer product is to let the jury hear all the evidence relating to the course of conduct of both the industry, and the particular manufacturer."  *Id.* at 143.

*Robinson's* guidance compels this court to admit evidence of FMVSS 208 and compliance with industry custom and practice in the design and testing of airbag systems.  Both this case and *Robinson* are strict liability product defect cases.  Both cases raise admissibility questions regarding safety standards and industry custom.  The major difference is that the safety standards and customs at issue in *Robinson* were post-manufacture.  Where post-manufacture evidence is admissible and relevant to the question of design defect, then the standards and customs in effect *during* the design and manufacture process must be equally, if not more, relevant to the issue of a manufacturer's culpability.  As explained by the Nevada high court, "the best way to determine if a defendant should have built a safer product is to let the jury hear all the evidence relating to the course of conduct of both the industry, and the particular manufacturer."  *Id.*  Accordingly, the court finds it appropriate to admit the regulatory and industry evidence.

Confirming this result is the high court's recent decision in *Michelin N. Am., Inc. v. Deal*, 2012 Nev. Unpub. LEXIS 770 (May 23, 2012).  There, the Nevada Supreme Court held that federal safety standards that govern the automotive products are admissible.  In *Deal*, the plaintiff sued

Michelin on a strict products liability theory for an allegedly defective tire.  Michelin sought to introduce evidence that the tire complied with FMVSS 119, the federal safety standard governing light truck tires at the time of the accident.  Plaintiffs challenged the admissibility of FMVSS 119, arguing that it was an outdated safety standard, as evidenced by an updated version, FMVSS 139, that was released after the accident.  The Supreme Court upheld the trial court's admission of FMVSS 119 and exclusion of FMVSS 139.  It explained:

> On appeal, the Deals argue that evidence of FMVSS 119 alone was misleadingly incomplete without evidence of FMVSS 139 to reflect the updated standard of the National Highway Traffic Safety Administration [NHTSA].  We find this claim to be unpersuasive, as it is undisputed that FMVSS 119 alone governed the performance requirements for light truck tires manufactured prior to 2007.  Thus, FMVSS 139 was not relevant to this matter because it was enacted 11 years after the subject tire was produced and 5 years after the accident occurred.

> Therefore, the district court acted within its discretion in admitting evidence of FMVSS 119 and excluding evidence of FMVSS 139.

*Id.* at 12-13.

The *Deal* decision supports admission of FMVSS 208, as it is undisputed that FMVSS 208 governed the performance requirements for occupant protection in a frontal collision.

For the reasons mentioned above, the motion is DENIED.

**8.      Plaintiffs' Motion in Limine No. 8 – Motion To Exclude Evidence Concerning Ford's 5-Star Rating from Safercar.gov**

Ford does not oppose the granting of this motion, it is therefore GRANTED.

**9.      Plaintiffs' Motion in Limine No. 9 – Motion to Exclude Evidence Regarding Crash Tests of Vehicles other than the 2005-2007 Ford Focus**

Plaintiffs move to exclude any testimony from any of Ford's witnesses, including Mr. Gerald E. Corwin, discussing New Car Assessment Program (NCAP) crash tests of vehicles other than the 2005-2007 Ford Focus.  These vehicles were not equipped with airbags and the tests conducted a 35 mph impact into an offset frontal barrier, not a pole.  Given the dissimilarity between the test parameters and the facts of the instant crash, plaintiffs submit that the test results are irrelevant and inadmissible.

James C. Mahan
U.S. District Judge

- 16 -

1   Ford opposes the motion, arguing that plaintiffs have misconstrued the relevance of the

2   NCAP tests.  The NCAP tests are not intended to compare the 2007 Ford Focus's performance to

3   those of the tested vehicles.  Rather, they are relevant for establishing that fatal head injuries do not

4   occur in 35 mph impacts for belted occupants, let alone a 13-14.5 mph impact like the Niemeyer

5   crash.  As such, the tests are relevant to dispute plaintiffs' theory that Mr. Niemeyer sustained a fatal

6   head trauma as a result of the instant car accident.

7   The motion is DENIED because the NCAP data is relevant to disproving plaintiffs' theory

8   of liability.  Evidence is relevant if "it has any tendency to make a fact more or less probable than

9   it would be without the evidence; and the fact is of consequence in determining the action."  Fed.

10  R. Evid. 401.  Here, plaintiffs' primary theory of liability is that the airbag and passenger restraint

11  system in the Ford Focus was faulty because the airbags did not deploy, causing Mr. Niemeyer's

12  head to strike the steering wheel with sufficient force to cause his death.  While the NCAP crash

13  testing has no bearing on the 2007 Ford Focus, the data does tend to make plaintiffs' theory less

14  probable by evincing that a lack of airbags fails to cause fatal head trauma in a 35 mph crash (a speed

15  more than twice the velocity of Mr. Niemeyer's Focus).

16      **10.     Plaintiffs' Motion in Limine No. 10 – Motion to Exclude Expert Opinion**

17              **Testimony not Included in Expert Reports or Depositions**

18  Ford does not oppose the granting of this motion, it is therefore GRANTED.

19      **11.     Plaintiffs' Motion in Limine No. 11 – Motion to Exclude the Bosch Reports and**

20              **Testimony of Bosche Employee, Phillip Ode**

21  Plaintiffs seek to exclude introduction of evidence or testimony relating to the Bosch Event

22  Data Recorder ("EDR").  The EDR is essentially a vehicle's "black box" system that records, among

23  other things, the impact speed during a motor vehicle crash.  Plaintiffs argue that the EDR data at

24  issue in this case (1) constitute unreliable hearsay; (2) contain multiple errors on their face; (3) are

25  not verifiable; (4) were not produced by Bosch.  Additionally, plaintiffs contend that (5) Mr. Ode

26  is neither qualified to interpret EDR data nor does he lay a proper foundation for admission of the

27  data.  The court addresses only the third and fifth of these grounds, as it finds them dispositive.

28

**James C. Mahan**
**U.S. District Judge**

1    Plaintiffs complain that the EDR data reports are the product of a secret and unverifiable

2  process.  Prior to Bosch downloading the hexadecimal (EEPROM) data from the EDR device, it

3  required the parties to agree to a protocol.  The protocol states that Bosch "will not release and will

4  not be required to release its highly confidential and commercially sensitive EEPROM data."

5  Further, Bosch declined to produce certain documents that plaintiffs argue they needed to examine

6  the conclusions Mr. Ode reached in his report.  Ford argues that the plaintiffs previously agreed to

7  Bosch's protocol and cannot now object.

8    The court agrees with plaintiffs that the lack of any means to verify the EDR data leads to

9  serious concerns regarding the data's reliability and accuracy.  Such concerns militate against the

10  admissibility of the data.  Here, Ford seeks to tender the results of the EDR data, without producing

11  any evidence regarding how the EEPROM recordings contained in the EDR were converted into the

12  ultimate report Mr. Ode is testifying to.  Without this critical evidence, plaintiffs have no ability to

13  verify the accuracy of the EDR data and cannot effectively cross-examine Mr. Ode or challenge the

14  EDR evidence.  *See United States v. Dioguardi*, 428 F.2d 1033, 1038 (2d Cir. 1970).

15    In *Dioguardi*, the Second Circuit held that the lower court erred in admitting a computer

16  generated report without requiring evidence establishing how the computer program worked.  The

17  court specifically stated that the opponent of such computer-generated evidence are "entitled to know

18  what operations the computer had been instructed to perform and to have the precise instruction that

19  had been given." *Id.*  The court further explained, "it is quite incomprehensible that the prosecution

20  should tender a witness to state the results of a computer's operations without having the program

21  available for defense scrutiny and use on cross-examination if desired." *Id.*; *see also* B. Weinstein

22  and M.A. Berger, Weinstein's Federal Evidence § 900.05(2)(d)(ii) and § 900.03 (2d. ed. 2006).

23    Ford is doing that which *Dioguardi* expressly forbade.  Plaintiffs have been afforded no

24  information regarding the EEPROM data, how that raw data is converted into a human readable

25  format, what the source code for the conversion is, or any other means to verify that the program

26  worked as intended.  Mr. Ode has admitted that he has no knowledge regarding the inner workings

27  of the Bosch technology and how data in the EDR converted.  Under such circumstances, this court

28

James C. Mahan
U.S. District Judge

- 18 -

cannot find the evidence admissible.  *See* Mot., Ex. R, Ode Depo. at 40:24-41:16, 71:5-8.

Whereas the court has found that the EDR data is not verifiable and that Mr. Ode cannot lay a proper foundation, it need not address the remaining grounds upon which plaintiffs seek to exclude this evidence.  The motion is therefore GRANTED.

**12.      Plaintiffs' Motion in Limine No. 12 – Motion to Exclude Introduction of Litigation Sled Testing**

Plaintiffs seek to exclude four litigation sled tests conducted by Ford as irrelevant, misleading, and confusing.  Plaintiffs contend that the parameters under which the litigation sled tests were conducted were artificial and not substantially similar to the crash in question.  Plaintiffs assert that the sled test dummy was not placed in the appropriate pre-impact position (i.e. slumped over to the right).  The dummy was artificially supported with "shims" creating an impossible and unrealistic movement upon impact.  Lastly, the seatbelt system was neither set up nor operated in the manner that occurred during the collision. Mot. 31:8-9.

Ford opposes the motion, arguing that the sled testing measures the accuracy of plaintiffs' expert's hypothesis.  The testing was not intended to mimic or recreate the accident.

Plaintiffs cite to *White v. Ford Motor Co.*, 312 F.3d 998, 1009 (9th Cir. 2002) and to *Cooper v. Firestone Tire and Rubber Co.*, 945 F.2d 1103, 1105 (9th Cir. 1991) in support of the argument that "evidence of other incidents including testing must be 'similar' in *all* respects to be admissible." Mot. 34:11-13 (emphasis in original).  The substantially similar doctrine "rests on the concern that evidence of dissimilar accidents lacks the relevance required for admissibility under Federal Rules of Evidence 401 and 402."  *Cooper*, 945 F.2d at 1105.

The substantial similarity doctrine is only applicable "when a party attempts to use evidence of other accidents as direct proof of negligence, a design defect, or notice of the defect." *See White*, 312 F.3d at 1009.  As the sled tests conducted by Ford were intended to test plaintiffs' theories, and not recreate the specific evidence, the court finds the substantial similarity doctrine inapplicable.

In *Gilbert v. Cosco, Inc.*, 989 F.2d 399 (10th Cir. 1993), the Tenth Circuit admitted sled tests for similar purposes.  There, as here, the sled tests were offered to undermine the scientific principles

**James C. Mahan**
**U.S. District Judge**

- 19 -

supporting the opposing party's hypothesis, not to explain what happened. *Gilbert*, 989 F.2d at 403. Plaintiffs' concerns that the sled testing may mislead the jury is similarly without merit. A limiting instruction informing the jury that the sled testing is only relevant to the extent that it tests plaintiffs' expert's opinion should be sufficient to safeguard against any jury confusion.

Accordingly, the motion is DENIED consistent with the forgoing. Plaintiffs shall file a proposed limiting instruction regarding the admissibility of the sled testing for the court's review no later than October 1, 2012. Ford's comments shall be filed within ten days after the proposed limiting instruction is filed.

### 13. Plaintiffs' Motion in Limine No. 13 – Motion to Exclude Opinion Testimony as to the Speeds, Locations, and Times by Ford's Expert Cleve Bare

Plaintiffs seek to exclude any testimony by Ford's expert, Cleve Bare, regarding the speed of Mr. Niemeyer's car "at any time prior to impact with the tree, as well as any opinions regarding the time before the tree impact that any other vehicle movements may have occurred." Mot. 35:3-5.

Mr. Bare admitted that he had made no calculation as to the speed of Mr. Niemeyer's car at any time prior to the collision with the tree. Mot. at Ex. Y, Bare's February 8, 2011 Depo., 44:9-25. Plaintiffs thereby conclude that any conclusions from Mr. Bare relating to the car's speeds and locations prior to impact are inadmissible speculation and request that they be excluded.

Ford represents that Mr. Bare did provide testimony concerning the "timing" of the car given certain assumptions concerning the car's speed and position, "including an opinion about the time and distance it would have taken the [car] to brake to a stop without hitting the tree." Resp. 2:11-14. Ford asserts that these opinions are based on specialized knowledge, are helpful to the trier of fact, and are reliable.

As previously explained, a qualified expert witness may testify in the form of an opinion if the following circumstances are met: (a) the expert's specialized knowledge will assist the trier of fact with understanding evidence or determining a fact at issue, "(b) the testimony is based on sufficient facts or data, (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliable applied the principles and methods to the facts of the case." Fed. R. Evid.

James C. Mahan
U.S. District Judge

702.

Here, Mr. Bare's opinions fall within the scope of Rule 702 and were properly disclosed to plaintiffs during discovery.  Mr. Bare's timing analysis is the product of reliable principles, not tied to a specific analysis of the speed of the subject vehicle.  Instead, they are based on various assumptions concerning speed.  Mr. Bare's reconstruction diagram is based on sufficient data as it is derived from physical evidence and photographs documented by the investigating police officers.  Furthermore, Mr. Bare did timely present the opinions sought to be introduced at his deposition and in his expert report.  Accordingly, the motion is DENIED.

**14.    Plaintiffs' Motion in Limine No. 14 – Motion to Exclude Evidence or Argument Concerning the Absence of Prior Incidents Involving 2005-2007 Ford Focus Vehicles**

Ford does not oppose the granting of this motion, it is therefore GRANTED.

IT IS SO ORDERED.

DATED August 9, 2012.

_____
**UNITED STATES DISTRICT JUDGE**