# EXHIBIT A

# EXHIBIT A

---

317

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
THE HON. JAMES C. MAHAN, U.S. DISTRICT JUDGE, PRESIDING

KATHRYN A. NIEMEYER, et al.,  )
                              )
            Plaintiffs,       )  Case No.
                              )  2:09-cv-2091-JCM-PAL
        vs.                   )
                              )
FORD MOTOR COMPANY,           )    DAY 2
                              )    P.M. SESSION
            Defendant.        )
                              )

O R I G I N A L

REPORTER'S TRANSCRIPT OF JURY TRIAL
Tuesday, October 30, 2012

APPEARANCES: (See page 2)

Court Reporter:   Felicia Rene Zabin, FCRR, RPR, CCR 478

---

2:09-cv-2091-JCM-PAL - October 30, 2012

318

```
 1   APPEARANCES:
 2   For the Plaintiffs:
 3        BRADLEY D. KUHLMAN, ESQ.
          CHAD LUCAS, ESQ.
 4        Kuhlman & Lucas, LLC
          1100 Main Street, Suite 2550
 5        Kansas City, Missouri 64105
          (816) 799-0330
 6
          DANIEL T. RYAN, ESQ.
 7        Law Offices of Daniel T. Ryan, LLC
          10525 Big Bend Boulevard
 8        St. Louis, Missouri 63122
          (314) 222-7717
 9
10   For the Defendant:
11        DANIEL S. RODMAN, ESQ.
          Snell & Wilmer
12        600 Anton Boulevard, Suite 1400
          Costa Mesa, California 92626
13        (714) 427-7000
14        JAY JOSEPH SCHUTTERT, ESQ.
          JOSHUA COOLS, ESQ.
15        Snell & Wilmer, LLP
          3883 Howard Hughes Parkway, Suite 1100
16        Las Vegas, Nevada 89169
          (702) 784-5200
```

FELICIA R. ZABIN, FCRR, RPR, CCR 478    (702) 676-1087

---

2:09-cv-2091-JCM-PAL - October 30, 2012

319

```
                    I N D E X
WITNESS:            Direct   Cross    Redirect
Plaintiffs':
  Mary Case          320      328      375
  Frank G. Pape      381      393      402
  Karen Michelle Port 407     424       --
  Ann Weese          430      438      443


                    EXHIBITS
EXHIBIT NO.:                MARKED/OFFERED    RECEIVED
Plaintiffs':
  211                            381             381
```

FELICIA R. ZABIN, FCRR, RPR, CCR 478    (702) 676-1087

---

2:09-cv-2091-JCM-PAL - October 30, 2012

320

LAS VEGAS, NEVADA, TUESDAY, OCTOBER 30, 2012, 2:13 P.M.

--oOo--

PROCEEDINGS

(Mary Case, M.D., resumes the witness stand.)

(Jury enters the courtroom at 2:21 p.m.)

THE CLERK: All rise.

THE COURT: All right. Thank you. You may be seated. Will the parties stipulate to the presence of the jury?

MR. KUHLMAN: Yes, your Honor.

MR. RODMAN: Yes, your Honor.

THE COURT: All right.

Dr. Case, I remind you you're still under oath.

And you may resume your examination.

MR. KUHLMAN: Thank you, your Honor.

DIRECT EXAMINATION (Continued)

BY MR. KUHLMAN:

Q. Dr. Case, before lunch I think I had asked you a question on have you published peer review journal articles that discuss subdural hemorrhage and subarachnoid as markers for diffuse axonal injury?

A. I have.

Q. Okay. And about how many do you think?

A. Three or four.

Q. Okay. And is the reference or the initials for diffuse

FELICIA R. ZABIN, FCRR, RPR, CCR 478    (702) 676-1087

2:09-cv-2091-JCM-PAL - October 30, 2012

354

1  ventricles dying of cardiac arrythmias.
2  A. Oh, sure.
3  Q. Okay.
4  A. We have a lot of people that have enlarged ventricles --
5  that's what hypertension is -- and they have very thick hearts
6  and they die. It's a dangerous disease. Mr. Niemeyer was not
7  in that category.
8  Q. He was getting close to it, but he wasn't right there yet --
9  A. He was --
10 Q. -- true?
11 A. -- getting close, but he was --
12 Q. Right.
13 A. -- not there.
14 Q. And, just so we're clear, didn't see any evidence of skull
15 fractures when you palpated his head?
16 A. No.
17 Q. All right. Didn't see any evidence of jaw or facial bone
18 fractures when you palpated his head; correct?
19 A. Correct.
20 Q. And you did a microscopic examination of was his brain and
21 you made some slides. True?
22 A. That is true.
23 Q. And, from your review of those slides, his brain was
24 unremarkable, meaning it was normal. True?
25 A. It is normal. And, as I indicated, because he was dead so

FELICIA R. ZABIN, FCRR, RPR, CCR 478    (702) 676-1087

---

2:09-cv-2091-JCM-PAL - October 30, 2012

355

1  shortly after the injury, we would not expect to see anything.
2  There is no way to see any kind of change that would occur in
3  that length of time.
4  Q. So what you had to look at, what you saw showed normal.
5  True?
6  A. His brain was perfectly normal.
7  Q. So there were no injuries that you could see on the slides?
8  A. That is correct.
9  Q. Now, in your post-mortem examination, you list out six
10 pathological findings; correct?
11 A. That sounds about right. Under the closed-head trauma,
12 there are six findings. Correct.
13 Q. Right.
14         We got contusions to the forehead, abrasion to the
15 cheek, laceration to the jaw, subgaleal hemorrhage, subarachnoid
16 hemorrhage, and subdural hemorrhage; correct?
17 A. Yes, those are the findings. Those are the things that I
18 saw at autopsy.
19 Q. And none of those six issues would be sufficient to render
20 Mr. Niemeyer unconscious; correct?
21 A. If you look individually at those things, those items would
22 not cause him to be unconscious. It is what you look at and you
23 put that: What does that mean? What is the mechanism that has
24 created those injuries? And that's what tells you what he has
25 is diffuse axonal injury.

FELICIA R. ZABIN, FCRR, RPR, CCR 478    (702) 676-1087

---

2:09-cv-2091-JCM-PAL - October 30, 2012

356

1  Q. And, beyond that, none of those six findings would be
2  sufficient to render him immediately pulseless. True?
3  A. None of those things would render him pulseless.
4  Q. Okay. And, in your post-mortem examination that I presume
5  you have a copy of up there, you never mention the words
6  "diffuse axonal injury" in it, do you?
7  A. No. The only time I mention that is if I do the microscopic
8  and I can demonstrate that microscopically then that is a
9  finding. Under where it says "pathology findings," that is what
10 I have listed one, two, three, four, five, six. If I had been
11 able to microscopically see the diffuse axonal injury, which
12 sometimes I can, and then I put that on there as a finding.
13 It's not a finding if you don't find it.
14 Q. Right.
15 A. I can tell you that it's my opinion that it's there because
16 of these other things that have the same mechanism. But it's
17 not a finding.
18 Q. So simply put, Dr. Case, you don't list what you can't
19 demonstrate and you couldn't demonstrate the diffuse axonal
20 injury. True?
21 A. I think I've said that. That is correct.
22 Q. Now, you -- you told us about some of the subdural and
23 subarachnoid blood that -- that you saw when you did your
24 autopsy. Do you recall that testimony?
25 A. Yes, I do.

FELICIA R. ZABIN, FCRR, RPR, CCR 478    (702) 676-1087

---

2:09-cv-2091-JCM-PAL - October 30, 2012

357

1  Q. And is it your opinion that is the result of some torn
2  bridging veins?
3  A. Yes.
4  Q. Can you tell us how many bridging veins were torn, Dr. Case?
5  A. No. There would be no way to tell that.
6  Q. Are torn bridging veins fatal injuries by themselves?
7  A. No, they are not. That just tells you that the brain has
8  moved in a way that is damaging to those bridging veins and
9  damaging to the axonal processes.
10 Q. You can tear bridging veins in a -- in a minor fall or head
11 impact, can you not?
12 A. Not usually, no.
13 Q. Could you --
14 A. You have to get a lot of motion of your head to create
15 movement of the brain. It's not something -- I couldn't sit
16 here and shake my head and cause that to happen, which is very
17 fortunate. You can't do it, for example -- you can actually
18 measure these things in experimental animals. And so we can
19 gauge the kind of forces. And so we're talking about a lot of
20 force.
21 Q. You can have torn bridging veins, Dr. Case, without having a
22 severe diffuse axonal injury. True?
23 A. Yes. I could open up the head and I could -- I could stick
24 a knife into -- into the cranial cavity and I can cut a bridging
25 vein and without doing any damage to the brain. So it depends

FELICIA R. ZABIN, FCRR, RPR, CCR 478    (702) 676-1087

2:09-cv-2091-JCM-PAL - October 30, 2012

446

1   THE CLERK: All rise.
2           (Judge Mahan leaves the bench.)
3           (Jury leaves the courtroom.)
4           (Proceedings adjourned at 4:55 p.m.)
5                       --oOo--
6   I hereby certify that pursuant to Section 753, Title 28, United
7   States Code, the foregoing is a true and correct transcript of
8   the stenographically reported proceedings held in the
9   above-entitled matter.
10
11  DATED: October 30, 2012        /s/ Felicia Rene Zabin
                                 FELICIA RENE ZABIN, RPR, CCR NO. 478

FELICIA R. ZABIN, FCRR, RPR, CCR 478      (702) 676-1087

---

665

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
THE HONORABLE JAMES C. MAHAN, DISTRICT JUDGE PRESIDING

KATHRYN A. NIEMEYER, et al.,  )
                              )
          Plaintiffs,         )
                              )   CASE NO.:
     vs.                      )   2:09-cv-2091-JCM-PAL
                              )
FORD MOTOR COMPANY,           )
                              )
          Defendant.          )   O R I G I N A L
_____)

REPORTER'S TRANSCRIPT OF JURY TRIAL DAY FOUR, A.M. SESSION
Friday, November 1, 2012

APPEARANCES:
See Page 2

HEATHER K. NEWMAN, CCR 774
Official Federal Reporter

---

Thursday, November 1, 2012 - 2:09-cv-2091-JCM-PAL

667

```
                I N D E X
WITNESSES:           DIRECT    CROSS    REDIRECT    RECROSS
Robert Caldwell                669        738
Mariusz Ziewjewski    753




                E X H I B I T S
                              OFFERED       RECEIVED
                                IN             IN
EXHIBIT NO:                  EVIDENCE       EVIDENCE
  7-5                          721            721
  12                           680            680
  17 - 20                      727            727
  501-13                       733            733
  586-192                      708            708
  821 - 823                    711            712
  824                          737            737
```

HEATHER K. NEWMAN, FOCR, RPR, CCR 774   (702)464-5828

---

Thursday, November 1, 2012 - 2:09-cv-2091-JCM-PAL

666

APPEARANCES:
FOR THE PLAINTIFFS:     RALPH J. ROHAY, ESQ.
                        309 West Lake Mead Pkwy., Suite B
                        Las Vegas, NV  89015
                        (702) 737-1122

                        LAW OFFICES OF DANIEL T. RYAN, LLC
                        BY:  DANIEL T. RYAN
                        10525 Big Bend Boulevard
                        St. Louis, MO  63122
                        (314) 222-7717

                        KUHLMAN & LUCAS, LLC
                        BY:  BRADLEY D. KUHLMAN
                             CHAD C. LUCAS
                        1100 Main Street, Suite 250
                        Kansas City, MO  64105
                        (816) 799-0330

FOR THE DEFENDANT:      SNELL & WILMER LLP
                        BY:  DANIEL S. RODMAN
                        600 Anton Boulevard, Suite 1400
                        Costa Mesa, CA  92626
                        (714) 427-7000

                        SNELL & WILMER LLP
                        BY:  JAY JOSEPH SCHUTTERT
                             JOSHUA D. COOLS
                        3883 Howard Hughes Parkway
                        Suite 1100
                        Las Vegas, NV  89169
                        (702) 784-5200

HEATHER K. NEWMAN, FOCR, RPR, CCR 774   (702)464-5828

---

Thursday, November 1, 2012 - 2:09-cv-2091-JCM-PAL

668

LAS VEGAS, NEVADA; THURSDAY, NOVEMBER 1, 2012; AT 9:03 A.M.
                          -oOo-
                    P R O C E E D I N G S

     (Jury returned to courtroom at 9:03 a.m.)
     THE CLERK:  All rise.
     THE COURT:  All right.  Thank you.  You may be seated.
     Do the parties stipulate to the presence of the jury?
     MR. RODMAN:  Yes, Your Honor.
     THE COURT:  Plaintiffs stipulate to the presence of the jury?
     MR. KUHLMAN:  Yes, Your Honor.
     THE COURT:  All right.
     Call your next witness.
     MR. RODMAN:  I believe Mr. Caldwell is on -- going to start cross-examination, Your Honor.
     THE COURT:  Oh, I'm sorry, you're exactly right.
     Mr. Caldwell, come forward and be -- you don't need to be sworn, I remind you that you're still under oath.
     Do you understand?
     THE WITNESS:  Yes, Your Honor.
     THE COURT:  Thank you.
     MR. RODMAN:  May I proceed?
     THE COURT:  Whenever you're ready, sir.  Yes, sir.

HEATHER K. NEWMAN, FOCR, RPR, CCR 774   (702)464-5828

Case 2:09-cv-02091-JCM-PAL   Document 205-1   Filed 11/05/12   Page 6 of 16

773

1  THE COURT: Yes, sir. Come around over here
2  (indicating).
3  MR. RODMAN: Thank you.
4  BY MR. KUHLMAN:
5  Q. Okay. Dr. Ziejewski, now, from here, can you explain to
6  the jury what you believe the biomechanics and occupant
7  kinematics were of Mr. Niemeyer during the crash sequence with
8  the tree.
9  A. Well, first of all, let's understand the general direction
10 of force. This is a frontal impact, so obviously body's moving
11 forward.
12      Now, if you have seatbelts worn the way how we wear
13 it and if the seat -- if your body position essentially is
14 center in the seat and the seatbelt lock in, your head will not
15 get to the steering wheel. There will be no contact between
16 the head and the steering wheel.
17      Obviously those seatbelts are not the seatbelts like
18 we have in military, in the planes, in ejection seats, or race
19 car drivers. They are not five-point harnesses. So one thing
20 that can happen is -- can we rotate the buck to move a bit?
21 MR. KUHLMAN: Which way?
22 THE WITNESS: Counterclockwise.
23      I hope you are going to see through the window.
24 (Exhibit was rotated.)
25      Okay. That's fine.

774

1      The body can slip out to the right-hand side so, if
2  I'm holding -- if I hold the belt locked so I would not allow
3  an extra length of the belt -- if I ask our helper to move
4  towards the center sideways and show me whether or not -- well,
5  he's -- okay, hold on, this side, just show me if your upper
6  body can slip out from the shoulder belt. Can you move
7  completely to the right? Completely right. Here we go. .
8  (Surrogate demonstrating.)
9      So obviously the reason that this can happen, because
10 you have a shoulder harness on this -- shoulder belt on left
11 shoulder and not on the right shoulder. So, you can slip out
12 or upper body can slip out to the right.
13      So if for some reason you move towards the center of
14 the vehicle before the event, the shoulder belt -- okay. Go
15 ahead, move again (demonstrating) -- will slip off the
16 shoulder.
17      Now, the belt will be locked. The body is moving
18 forward to the side. The surrogate is not moving forward
19 because I don't have the strength to keep the belt, he's a big
20 guy, but if the belt locks in, you move forward and you have
21 only left shoulder kept, the body will have a tendency to
22 rotate.
23      So, what I concluded, that if he's sitting central --
24 and I will lock the belt -- no way his head can come in contact
25 with steering wheel. Actually I did some surrogate work and I

775

1  show that I need approximately not quite a foot, but about 10
2  inches of slack or 10 inches of additional length of the
3  shoulder belt -- if you lean forward slowly -- for him -- and
4  just move your head towards -- can you touch the steering
5  wheel -- no, move further toward -- somewhere around there, you
6  need several -- yeah, that's fine -- you need several inches of
7  additional length -- yeah, you can go back -- additional length
8  of the shoulder belt for it to occur. If you assume the
9  seatbelt worked properly, and there's no indication it did not,
10 there will not be additional 10 inches of the -- of the belt.
11      So what remains is the other possibility that his
12 body is leaning to the right -- well, go to the right and
13 forward -- so the belt is off -- no, even -- off his shoulder,
14 and I cannot tell you whether or not the shoulder belt is on
15 the elbow or in the mid-biceps, cannot tell you, but it slips
16 off the shoulder and at that time -- if you lean forward -- try
17 to see if you can touch the steering wheel, come close -- you
18 could -- you could force the body to come into contact with the
19 steering wheel.
20      Okay. All right.
21      So I concluded that, assuming there's no evidence of
22 extra length of the belt and the belt worked properly, he was
23 not seated -- seated straight at the time of the collision.
24 Something caused him to move to the side and the shoulder belt
25 was off the shoulder at that time the contact was with the

776

1  steering wheel could occur.
2      So we are done with the Part A, the first -- the
3  first body motion before head strike with anything inside the
4  vehicle.
5  BY MR. KUHLMAN:
6  Q. And where do you believe his first head strike occurred
7  within the vehicle?
8  A. Now the Area B, that is the interaction between the head
9  and the interior of the vehicle, and I am aware that you have
10 familiarity with the type of injuries and bruising and
11 lacerations that have been recorded in medical documents. We
12 have impact to the front temporal area and then we -- on the
13 right-hand side. Then we have an impact on the left-hand side,
14 and we have some abrasion-type injury around cheek area and
15 then -- or upper cheekbone area and then we have some
16 additional laceration in the cheek. And also we know that the
17 windshield lever was broken.
18      So now we try to explain what happened. So, here is
19 the body kinematics that is the most likely body kinematics in
20 this case.
21      Lean a little bit to the right.
22      (Surrogate complies.)
23      THE WITNESS: You are off -- the shoulder belt is off
24 the shoulder. We are moving forward and your -- your front
25 right-hand side of the head comes into contact with the

Thursday, November 1, 2012 - 2:09-cv-2091-JCM-PAL

783

                              * * *

1  
2   I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct  
3   transcript of the stenographically reported proceedings held in the above-entitled matter.  
4  
5   DATED: 11-1-2012            /s/ Heather K. Newman  
                              HEATHER K. NEWMAN  
6                          U.S. Court Reporter  
                              CCR 774

HEATHER K. NEWMAN, FOCR, RPR, CCR 774   (702) 464-5828

**Page 784**

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
THE HON. JAMES C. MAHAN, U.S. DISTRICT JUDGE, PRESIDING

KATHRYN A. NIEMEYER, et al., )
)
Plaintiffs, ) Case No.
) 2:09-cv-2091-JCM-PAL
vs. )
)
FORD MOTOR COMPANY, ) DAY 4
) P.M. SESSION
Defendant. )
)

ORIGINAL

REPORTER'S TRANSCRIPT OF JURY TRIAL
Thursday, November 1, 2012

APPEARANCES: (See page 2)

Court Reporter:  Felicia Rene Zabin, FCRR, RPR, CCR 478

**Page 785**

APPEARANCES:
For the Plaintiffs:
  BRADLEY D. KUHLMAN, ESQ.
  CHAD LUCAS, ESQ.
  Kuhlman & Lucas, LLC
  1100 Main Street, Suite 2550
  Kansas City, Missouri 64105
  (816) 799-0330

  DANIEL T. RYAN, ESQ.
  Law Offices of Daniel T. Ryan, LLC
  10525 Big Bend Boulevard
  St. Louis, Missouri 63122
  (314) 222-7717

For the Defendant:
  DANIEL S. RODMAN, ESQ.
  Snell & Wilmer
  600 Anton Boulevard, Suite 1400
  Costa Mesa, California 92626
  (714) 427-7000
  JAY JOSEPH SCHUTTERT, ESQ.
  JOSHUA COOLS, ESQ.
  Snell & Wilmer, LLP
  3883 Howard Hughes Parkway, Suite 1100
  Las Vegas, Nevada 89169
  (702) 784-5200

**Page 786**

INDEX
WITNESS:           Direct  Cross
Plaintiffs':
  Mariusz Ziejewski    791    797
  Christopher Caruso   822    860

EXHIBITS
EXHIBIT NO.:           MARKED/OFFERED   RECEIVED
Plaintiffs':
  87                    796              796
  90                    798              798
  245                   821              821
  304A, 304B, 304C, and 304D   822       822

**Page 787**

LAS VEGAS, NEVADA; THURSDAY, NOVEMBER 1, 2012; 1:31 P.M.
--oOo--
PROCEEDINGS
  THE CLERK: All rise.
  THE COURT: Thank you. You may be seated.
  All right. I've reviewed the materials that you --
both sides submitted.
  How much longer are you gonna -- did you intend to be
with this witness?
  MR. KUHLMAN: Only about 15 minutes at most.
  THE COURT: All right.
  And then you're finished with him?
  MR. KUHLMAN: Correct.
  THE COURT: All right.
  It's -- he reminds me a little bit of the lion from The
Merchant Venice, Shakespeare's play. The devil can cite
scripture for his purposes, which means you can find anything in
scripture to support any position you want to take. And so I --
I think it's a little bit the same thing here. I think it's
more a matter of credibility and cross-examination.
  Let me just refer you to the February 15, 2012,
deposition. It says, "Ford submittal, first depo." I think
this is from the defendant's side. Page 116:
  "Q. ... And, so, um, do you have an opinion was it --
was it more likely that Mr. Niemeyer had -- was leaning out of

Page 852

1  and he was not involved in the creation of this calibration
2  report. So that testimony is improper and lacks foundation.
3      THE COURT: He doesn't need to work at Ford in order to
4  comment on the testing.
5      MR. SCHUTTERT: Well, to comment that this is not
6  meeting up to Ford's expectations he doesn't have the foundation
7  for that.
8      THE COURT: Well, as I understand his testimony, it's
9  14.68 and he has a right to look at it.
10      MR. KUHLMAN: Mr. Krishnaswami.
11      THE COURT: Why do you say at 90 percent of it's not --
12  it doesn't meet the -- it doesn't immediate Ford's criteria?
13      THE WITNESS: Because it doesn't deploy. And -- and
14  Ford establishes a threshold, but they have to have margin.
15  The -- we talked about the margin earlier. You can't put a
16  system in the field -- again, this is a perfect laboratory crash
17  test. They know, I knew developing these systems it is not
18  gonna work like that in the real world.
19      You've got to have margin. You can't guarantee a
20  14.68-mile-per-hour all-fire threshold in a pole if you don't
21  have margin. If they ran the same exact laboratory test again,
22  they have a probability of failure. And that's where this
23  system is defective by design. It is not robust.
24  BY MR. KUHLMAN:
25  Q. Okay. And this is --

Page 853

1      THE COURT: So I'll overrule it and I'll allow him to
2  testify.
3      Go ahead.
4  BY MR. KUHLMAN:
5  Q. Do you have an opinion on whether or not there's a defective
6  design in this airbag system?
7  A. I -- I do. Again, there's two possible defects. And -- and
8  I can never rule out what I call a malfunction or a component
9  failure.
10      But, in a 2007 vehicle, that's so unlikely. The
11  systems are so well designed, diagnostics are so robust that the
12  probability of -- of Mr. Niemeyer driving down the road and
13  having a component, a sensor fail, is unlikely. Can't rule it
14  out.
15      But my experience tells me it's not likely the cause
16  which means that the system failed to deploy the airbag because
17  of something else and that's where I believe I -- I -- I -- I
18  think I've identified this as a design defect. It was already
19  flawed when they released the calibration like this into the
20  real world.
21  Q. Okay. And so is it your opinion that there's a design
22  defect in the airbag system?
23  A. Yes, there is.
24      MR. SCHUTTERT: Objection, your Honor. At his
25  deposition he plainly testified he couldn't identify whether it

Page 854

1  was a design defect or a manufacturing defect. I asked him that
2  very question and he said he couldn't tell me. And now we're
3  hearing something completely new.
4      THE COURT: All right. It's credibility in
5  cross-examination.
6  BY MR. KUHLMAN:
7  Q. Mr. Caruso, the other test at 22.7 -- can you clear that off
8  a little bit?
9  A. I can try. There we go.
10  Q. (Highlight.) Have I highlighted that test (pointing)
11  Mr. Caruso, on the Exhibit 245?
12  A. Yes, you have.
13  Q. And is that the -- what speed is that test run at?
14  A. This one, again, they -- we did this too. I mean, we -- we
15  call it a 23-mile-per-hour test, but their actual test is run at
16  22.7 miles per hour. We always -- we'd do the same. We called
17  it a 20-mile-per-hour pole, but it might have been run at 19.8.
18  But this is a 22.7-mile-per-hour centerline pole as opposed to
19  an offset pole. And, by the way, that low-speed pole was a
20  Centre Pole as well.
21      So this is a centerline pole (drawing) -- I'm not sure
22  how these arrows are coming up. I'm sorry -- about, again, it's
23  a centerline pole at 22.7 miles per hour. And, again, we know
24  it's above the 14.68-mile-per-hour threshold. We expect a
25  deployment.

Page 855

1  Q. Okay. And so at that 22.7-mile-an-hour test, did they get
2  deployments?
3  A. Yes. If you look again at the .9, scaling the signal down
4  by 10 percent, the original signal as received at a 100 percent
5  and then scaling the signal up by 10 percent, (drawing) you can
6  see that we get trigger times between 12.98 here (drawing) and
7  as high a's 14.23 (drawing) here. But, again, those are very
8  good trigger times. Well within the reasonable range of the
9  deployment of an airbag for a -- for a high-speed pole.
10  Q. Okay. And why is robustness and performance important in
11  airbag systems?
12  A. I kind of alluded to it already, but this is so important
13  for the jury to understand.
14      In the real word, meaning what happens out there, is
15  not gonna represent what happens in a laboratory. If I don't
16  release a system that by computer modeling and by perfect
17  laboratory environmental conditions is -- is not robust, if I
18  release a calibration or a system that is not robust here, what
19  happens out there is gonna be much worse.
20      You just don't have control of the real world. The
21  pole is gonna be a different size. The -- the vehicle may have
22  gone through 5 years or 10 years of aging by the time it hits
23  that -- that pole. You know, there's so many factors here that
24  lead to variation expected, expected real-world variation and
25  performance, that when it leaves my shop, when it leaves my

Page 856

1  design studio, it has to be as perfect as I can get it. And, if
2  it's not, I have to take a step back and figure out why and, if
3  possible, fix it.
4  Q. Did you look, also, at the airbag stage 2 test results?
5  A. Yes, I did.
6  Q. Okay. And did you look at those as they relate to pole
7  performance for the 2007 Focus?
8  A. I did. I looked specifically at these -- these three tests,
9  the only three tests that Ford ran.
10 Q. Okay. Were -- did you have any concerns about the
11 robustness in those tests?
12 A. I did. Again, it doesn't affect directly our Niemeyer case,
13 but it has a direct indication of the same problem that exists
14 even in stage 2.
15     (Exhibit 245, BUZ 37410, displayed in open
16     court.)
17 BY MR. KUHLMAN:
18 Q. Is that what's on the screen, which is BUZ 37410, reflect
19 stage 2?
20 A. Yes. Right up here (drawing) you can see AB2 belted.
21 That's airbag stage 2 for a belted occupant. And, again, I'm
22 looking at this because, you know, again, our occupant is belted
23 in this case. So -- so this is the most important area for us
24 to look at.
25 Q. Okay. And have I highlight the 22.7-mile-an-hour threshold

Page 857

1  test for stage 2?
2  A. You have. As before, it's Crash Test 13566 which is, you
3  know, (drawing) in simple numbers a 23-mile-per-hour centerline
4  pole. We know it was actually a 22.7-mile-per-hour centerline
5  pole.
6  Q. Okay. Can you explain to the jury what your concern is?
7  A. Yes. This is very important. We have dual-stage airbags;
8  right? Stage 1, stage 2. These inflators can be harmful and --
9  and in some cases, you know, can cause injury.
10     So, if we fire the first stage of an airbag system,
11 even if the second stage is not required, about a hundred
12 milliseconds after the first stage is done we're gonna fire the
13 second stage anyway. We don't want the second stage to go off
14 while the EMT's are clipping wires and extracting people out of
15 the vehicle.
16     So we do what we call "disposal." We -- we -- we fire
17 the second stage anyway when it's gonna be of no consequence to
18 the occupant but we get rid of it so that it doesn't cause any
19 harm to some- -- somebody who would come upon this inflator
20 later. In particular, I mentioned the EMT's, the emergency
21 technicians who are using the Jaws of Life and things like that
22 to cut people out of a vehicle. We don't want them injured by a
23 sudden -- you know, a deployment of a -- of a -- of an airbag
24 inflator.
25     And so what we -- what you see here is very important.

Page 858

1  We're looking again (drawing) at the 100 percent now, which is
2  the crash as run -- this is the -- it hit the barrier and that's
3  the data. It is what it is. We see that we might get an
4  (drawing) airbag deployment of -- again, stage 2, stage 2
5  belted -- we might get an airbag deployment at 47.23
6  milliseconds. Okay?
7      So this crash is severe enough that we might get a
8  second stage. We're supposed to now by their requirements. But
9  what happens when you look at all of the variation, the --
10 lookin' at just -- just sampling the crash a little differently.
11     The "113.7" means we didn't deploy. So we disposed of
12 it. We -- we -- we -- after a hundred milliseconds, we went
13 ahead and discarded that second stage even though it's not gonna
14 have any bearing on occupant protection.
15     Looking at .9 (drawing), the 90 percent, where you
16 scale the crash down a little bit, all you see is disposal.
17 There's no deployment at all.
18     So stage 1 deploys. And I think we showed those
19 numbers on the previous page, like 5 or 20 milliseconds. And
20 then a hundred milliseconds after stage 1 deploys we discharge
21 by disposing of and deploying stage 2. We just get rid of it so
22 no one can be injured or hurt by it later.
23 Q. So was the design robust enough for stage 2 at the
24 must-deploy threshold?
25 A. It is not because effectively that is their stage 2 all-fire

Page 859

1  threshold. It does not deploy under all conditions.
2      Now, again, this is not a direct bearing on our crash.
3  But it shows that they are having pole impact problems with this
4  calibration before it ever left the factory, before it ever left
5  the design studio. They are already in trouble. They can't
6  meet the pole impact requirements.
7  Q. Okay. In the Niemeyer crash, do you believe stage 1 should
8  have deployed?
9  A. It should have.
10 Q. And the fact that it didn't deploy, is that a defect in the
11 system?
12 A. Yes. The nondeployment of the stage 1 airbag in the
13 Niemeyer crash is unreasonably dangerous and defective.
14 Q. Okay. And, if the -- if the system was not defective, would
15 the airbag have deployed in that crash?
16 A. If it had been designed correctly and operated correctly,
17 the airbag would have deployed and he would have been protected
18 from this head injury.
19 Q. Okay. Thank you, Mr. Caruso.
20     MR. KUHLMAN: No further questions.
21     THE COURT: All right.
22     Cross-examination.
23     MR. SCHUTTERT: Thank you, your Honor.
24     (Pause in the proceedings.)
25 ///

Page 876

1  A. It does make sense. Yes.
2  Q. All right. So you'd agree, sir, that there are gonna be
3  some frontal crashes where the system's designed to deploy just
4  to the pretensioner but not the airbag; correct?
5  A. That is correct.
6  Q. Now, as part of your work in the case, sir, you don't have
7  any opinion what caused Mr. Niemeyer to lose control; cross the
8  center median; cross the two opposite lanes; jump the opposite
9  curb; and then impact the tree; correct?
10 A. I do not. No opinion.
11 Q. But you're aware from the work you've done in the case and
12 the things you reviewed that witnesses reported him slumping
13 over prior to losing control; correct?
14 A. I have read that.
15 Q. And, as part of your investigation, you're not aware of any
16 evidence of braking on the part of Mr. Niemeyer from the point
17 where he lost control of the vehicle up until the impact with
18 the tree; correct?
19 A. I am not, but I also have not studied that not as part of
20 this -- as part of my investigation.
21 Q. And, similarly, you're not aware of any evidence of -- of
22 steering from the initial loss of control to the point of impact
23 with the tree; correct?
24 A. I am not, but I have also not studied that.
25 Q. Okay. Now, even though you live just down the road in

Page 877

1  Henderson, sir, at the time you gave your deposition you told me
2  you had not been out to visit the scene of the crash; correct?
3  A. Correct. It wasn't really pertinent to my opinions.
4  Q. Plus the traffic can be bad from Henderson to Summerlin?
5  A. Probably. I don't go to Summerlin very often.
6  Q. But, as part of your work in the case, you did actually
7  inspect the subject vehicle. True?
8  A. I did.
9  Q. You went out to San Diego and inspected it at the home of
10 the current owner in August of 2010, I think; is that right?
11 A. You know, I don't remember the exact date. But that sounds
12 about right.
13 Q. And you didn't take any notes at your vehicle inspection,
14 did you?
15 A. No. The -- the vehicle had been repaired and I simply took
16 some photographs. And that was it.
17 Q. Okay. I mean, you jumped ahead to my next question.
18    At the time of your inspection, the vehicle was in its
19 immediate post-crash condition. It had been repaired and was
20 being driven around in use; correct?
21 A. That's correct.
22 Q. So there wasn't any physical evidence from the crash
23 involving Mr. Niemeyer for you to look at. True?
24 A. For me to look at. That's correct.
25    THE COURT: How much longer you going to be with this

Page 878

1  witness?
2     MR. SCHUTTERT: I'd say probably a half-hour.
3     THE COURT: All right.
4     Why don't we break at this time. It's almost 5:00
5  o'clock.
6     Is this a good stopping place?
7     MR. SCHUTTERT: Yeah, absolutely.
8     THE COURT: All right.
9     All right. Ladies and gentlemen, during this recess, I
10 again admonish you not to discuss the case among yourselves or
11 with anyone else; not to listen to, read, or watch any report
12 of, or commentary on the trial by any person connected with the
13 trial or by any medium of information including, without
14 limitation, newspaper, television, radio, or the Internet; and
15 you are not to form or express an opinion on any subject
16 connected with this case until it is finally submitted to you
17 under instructions from me for your deliberations.
18    So we'll be in recess until 9:00 a.m.
19    THE CLERK: All rise.
20    (Judge Mahan leaves the bench.)
21    (Jury leaves the courtroom.)
22    (Proceedings adjourned at 4:55 p.m.)

Page 2012

1           UNITED STATES DISTRICT COURT
2               DISTRICT OF NEVADA
3   THE HON. KENT J. DAWSON, U.S. DISTRICT JUDGE, PRESIDING
4
5   KATHRYN A. NIEMEYER, et al., )
                                 )
6        Plaintiffs,  ) Case No.
                      ) 2:09-cv-2091-JCM-PAL
7        vs.          )
                      )     DAY 4
8   FORD MOTOR COMPANY,    )    P.M. SESSION
                      )
9        Defendant.   )   ORIGINAL
                      )
10
11
12          CERTIFICATE
13
14  I hereby certify that the foregoing matter is transcribed from
15  the stenographic notes taken by me and is a true and accurate
16  transcription of the same.
17
18    /s/ Felicia Rene Zabin
      FELICIA RENE ZABIN, CCR No. 478
19    OFFICIAL FEDERAL REPORTER
20
21  Dated: November 2, 2012

## Page 1

2012 1102 Niemeyer TT05am Caruso_K Niemeyer.txt
Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
879

1    UNITED STATES DISTRICT COURT
2    DISTRICT OF NEVADA
3    THE HONORABLE JAMES C. MAHAN, DISTRICT JUDGE PRESIDING
4
5    KATHRYN A. NIEMEYER, et al.,
6         Plaintiffs,
                                CASE NO.:
7    vs.                        2:09-cv-2091-JCM-PAL
8    FORD MOTOR COMPANY,        Plaintiffs' Case-in-Chief
9         Defendant,
                                O R I G I N A L
10
11
12   REPORTER'S PARTIAL TRANSCRIPT OF JURY TRIAL DAY FIVE,
                      A.M. SESSION
13              Friday, November 2, 2012
14
15
16   APPEARANCES:
17   See Page 2

HEATHER K. NEWMAN, CCR 774
Official Federal Reporter

HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)464-5828
Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
Page 1

## Page 2

2012 1102 Niemeyer TT05am Caruso_K Niemeyer.txt
880

1    APPEARANCES:
2    FOR THE PLAINTIFFS:    RALPH J. ROHAY, ESQ.
                            309 West Lake Mead Pkwy., Suite B
3                           Las Vegas, NV  89015
                            (702) 737-1122
4
                            LAW OFFICES OF DANIEL T. RYAN, LLC
5                           BY:  DANIEL T. RYAN
                            10525 Big Bend Boulevard
6                           St. Louis, MO  63122
                            (314) 222-7717
7
                            KUHLMAN & LUCAS, LLC
8                           BY:  BRADLEY D. KUHLMAN
                                 CHAD C. LUCAS
9                           1100 Main Street, Suite 250
                            Kansas City, MO  64105
10                          (816) 799-0330
11   FOR THE DEFENDANT:     SNELL & WILMER LLP
                            BY:  DANIEL S. RODMAN
12                          600 Anton Boulevard, Suite 1400
                            Costa Mesa, CA  92626
13                          (714) 427-7000
14                          SNELL & WILMER LLP
                            BY:  JAY JOSEPH SCHUTTERT
15                               JOSHUA D. COOLS
                            3883 Howard Hughes Parkway
16                          Suite 1100
                            Las Vegas, NV  89169
17                          (702) 784-5200

HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)464-5828
Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
881
Page 2

## Page 3

2012 1102 Niemeyer TT05am Caruso_K Niemeyer.txt

1                          I N D E X
2    WITNESSES:       DIRECT    CROSS    REDIRECT    RECROSS
3    Christopher Caruso         882      920         --
4    Kathryn Niemeyer   925     965      979         --

11                        E X H I B I T S
12                                   OFFERED        RECEIVED
                                       IN              IN
13   EXHIBIT NO:                     EVIDENCE       EVIDENCE
14   287R, S, T, U, X & Z             934             935
15   525                              968             968
16   528                              970             970
17   529                              973             973
18   530                              975             975
19   531                              976             976
20   532                              977             977
21   806-7                            893             893

HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)464-5828
Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
882

1    LAS VEGAS, NEVADA; FRIDAY, NOVEMBER 2, 2012; AT 9:06 A.M.
Page 3

## Page 4

2012 1102 Niemeyer TT05am Caruso_K Niemeyer.txt
                         -oOo-
2
3                     P R O C E E D I N G S
4
5         *** EXCERPT OF TRANSCRIPT OF PROCEEDINGS ***
6
7         (Jury returned to courtroom at 9:03 a.m.)
8         THE CLERK:  All rise.
9         THE COURT:  All right.  Thank you.  You may be
10   seated.
11        Come forward and have a seat, please, sir.
12        THE WITNESS:  Thank you.
13        THE COURT:  Yes, sir.
14        I remind you you're still under oath.
15        Do you understand that?
16        THE WITNESS:  Yes, I do.
17        THE COURT:  All right.
18        You may resume your examination, Mr. Schuttert.
19        MR. SCHUTTERT:  Thank you, Your Honor.
20        THE WITNESS:  Yes, sir
21
22        FURTHER CROSS-EXAMINATION OF CHRISTOPHER CARUSO
23   BY MR. SCHUTTERT:
24   Q.   Welcome back, Mr. Caruso.
25   A.   Good morning.

HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)464-5828
Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
883

1    Q.   Mr. Caruso, you have not performed any testing as part of
2    your work in this case; correct?
3    A.   I have not.
Page 4

```
    2012 1102 Niemeyer TT05am Caruso_K Niemeyer.txt
16  Q.  And the RCM also controls the pre-tensioners.
17      True?
18  A.  Yes, it controls all of the electronics in the airbag
19  system.
20  Q.  So basically these systems work together, they analyze the
21  crash and then if necessary, the RCM deploys a safety device
22  based on crash severity to give the occupant the appropriate
23  level of protection.
24      True?
25  A.  That is correct.

            HEATHER K. NEWMAN, FOCR, RPR, CCR 774   (702)464-5828
              Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
                                                              892

 1  Q.  And in general, sir, higher level of crash severity, more
 2  safety features will be deployed.
 3      True?
 4  A.  That is correct.
 5  Q.  For this particular vehicle, the range of deployable
 6  features is nothing, all the way up to a high output airbag;
 7  correct?
 8  A.  That is correct. We called that airbag Stage 2 yesterday.
 9  Q.  Right.
10      And so in some frontal crashes, this system won't
11  deploy any safety features because the seatbelt can adequately
12  protect the occupant from hitting the front structures.
13      Correct?
14  A.  Seatbelt without the pre-tensioner, you mean?
15  Q.  Yes.
16  A.  Yes, and that's what we declared that to be below, in this
                                Page 13
```

```
    2012 1102 Niemeyer TT05am Caruso_K Niemeyer.txt
17  case, 7.6 miles per hour.
18  Q.  And by definition, sir, seatbelt is the primary restraint
19  in a vehicle; correct?
20  A.  It is supposed to be.
21  Q.  And the pre-tensioner and airbag supplement the seatbelt;
22  correct?
23  A.  Exactly. SIR, that term represents supplemental
24  inflatable restraint. It was always meant to be a supplement
25  to the seatbelt.

            HEATHER K. NEWMAN, FOCR, RPR, CCR 774   (702)464-5828
              Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
                                                              893

 1  Q.  So, in effect, you save the airbag for the higher severity
 2  crashes where it will provide an injury benefit to an occupant
 3  by keeping them off the front structures; correct?
 4  A.  Yes, exactly.
 5  Q.  Because if there is a risk of injury from hitting the
 6  front structures, an airbag is really of little or no benefit.
 7      True?
 8  A.  Correct. If the seatbelt alone can do the job, the airbag
 9  is not required or necessary.
10  Q.  And yesterday when we were talking, I believe with
11  Mr. Kuhlman, you referenced the system as a five-threshold
12  system.
13      True?
14  A.  Correct.
15      MR. SCHUTTERT: Your Honor, at this time I'd move to
16  admit Exhibit 806-7. I don't believe there's any objection
17  from the other side.
18      (Defense Exhibit 806-7 was
                                Page 14
```

```
    2012 1102 Niemeyer TT05am Caruso_K Niemeyer.txt
19      offered into evidence.)
20      MR. KUHLMAN: No objection, Your Honor.
21      THE COURT: All right. It will be admitted.
22      (Defense Exhibit 806-7 was
23      received into evidence.)
24  BY MR. SCHUTTERT:
25  Q.  Mr. Caruso, does this look like a severity threshold

            HEATHER K. NEWMAN, FOCR, RPR, CCR 774   (702)464-5828
              Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
                                                              894

 1  example?
 2  A.  Yes, it does. I had produced one of these but we couldn't
 3  use it because I had not submitted it prior, but I had one
 4  similar to this.
 5  Q.  This is something people in the industry are familiar with
 6  what this looks like?
 7  A.  Yes, correct.
 8  Q.  And this essentially walks us through the pre-tensioner,
 9  which is the lowest deployable future, all the way up to the
10  high output airbag; correct?
11  A.  Correct, and for the jury's purposes, the low output, we
12  described -- I described yesterday as Stage 1 and high output I
13  described as Stage 2. Given that substitution, they should
14  recognize what this means.
15  Q.  So, low output and Stage 1 are interchangeable terms?
16  A.  Correct.
17  Q.  And Stage 2 and high output, interchangeable terms?
18  A.  In my terminology they are interchangeable.
19  Q.  So, if we look at this severity threshold example, we see
                                Page 15
```

```
    2012 1102 Niemeyer TT05am Caruso_K Niemeyer.txt
20  pre-tensioner as the lowest deployable safety feature?
21  A.  Yes.
22  Q.  And then above that we see the unbelted low output;
23  correct?
24  A.  Correct.
25  Q.  And then above that we see the belted low output.

            HEATHER K. NEWMAN, FOCR, RPR, CCR 774   (702)464-5828
              Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
                                                              895

 1      True?
 2  A.  That is correct.
 3  Q.  You get more severe than that, you get into the unbelted
 4  high output; correct?
 5  A.  That is correct.
 6  Q.  And then the highest deployable safety feature for the
 7  most severe crashes is the belted high output threshold;
 8  correct?
 9  A.  That is correct.
10  Q.  And on this graph we see "event duration" on the bottom
11  and then we see "severity level" on the left-hand side,
12  suggesting that as severity goes up, the type of safety feature
13  will be deployed.
14      True?
15  A.  That is correct.
16  Q.  And as we mentioned earlier, the reason that they're lower
17  thresholds for unbelted occupants is because we don't have the
18  benefit of the airbag to keep them off the structures in the
19  vehicle.
20      True?
21  A.  That is correct. As a matter of fact, the diagram that I
                                Page 16
```

2012 1102 Niemeyer TT05am Caruso_K Niemeyer.txt

16    If you need it to fire all the time, let's say Stage
17 1 at 14.7 miles per hour, you need to have at least 10 percent
18 margin because if you don't run -- if you run that same exact
19 test again, it could fail just by nature of vehicle variability
20 and test variability. So that's why I don't -- as we said
21 before, there's a gray band. The system has error in
22 tolerance. They can't possibly be that precise that I can fire
23 at 14.7 but at 14.5, for example, I'm not going to fire.
24 That's impossible.
25 Q. Sir, you were not involved in the design of the sensors in

HEATHER K. NEWMAN, FOCR, RPR, CCR 774   (702)464-5828
Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
913

1  this vehicle, were you?
2  A. Not in this vehicle, I was not.
3  Q. Sir, you were not involved in the testing of the sensors
4  that Bosch and Ford did for this vehicle, were you?
5  A. No.
6  Q. You weren't involved in the creation of the calibration
7  sign-off document that we've talked about at length; correct?
8  A. I was not.
9  Q. And you haven't spoken to anyone at Ford or Bosch about
10 the calibration of the airbags in this vehicle, were you?
11 A. Only seen depositions of the appropriate people.
12 Q. So you have not spoken to anyone?
13 A. Correct, I have not.
14 Q. And certainly, sir, you are not qualified to come to this
15 court and speak on Ford's behalf, are you?
16 A. I'm qualified to come here and speak on behalf of our
Page 33

17 client on a defect in this system that is evident by a
18 non-deployment of an airbag where a fatality occurred. I'm not
19 going to declare that I designed or built this system. If I
20 had, there might be things very different in the system.
21 Q. Sir, my question was very simple. You're not here on
22 behalf of Ford to speak of the contents of the calibration
23 document as Ford sees them.
24    True?
25 A. As Ford sees them, correct.

HEATHER K. NEWMAN, FOCR, RPR, CCR 774   (702)464-5828
Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
914

1  Q. And as you alluded to, the reality is, you're being paid
2  by Mr. Kuhlman to review this document, come to court and give
3  us your impressions of it; correct?
4  A. Not just the document, but in general, yes.
5  Q. The materials, including that document; correct?
6  A. That is correct.
7  Q. And since you don't have any personal knowledge of the
8  testing and all the things that went into that document, you've
9  had to make some assumptions regarding the contents of that
10 document.
11    True?
12 A. Yes, I have.
13 Q. And one of those assumptions you made, sir, was that Ford
14 actually wanted the airbag to deploy at 90 percent of the
15 calibration in a 15 mile an hour pole hit for the belted
16 occupant; correct?
17 A. My assumption was if Ford wanted to deploy all the time,
18 meaning all-fire threshold at 14.7, then at 90 percent they
Page 34

19 would want that thing to fire as well.
20 Q. And that's just your --
21 A. It is an assumption, but that is my specific assumption.
22 Q. You are assuming that's what Ford wanted; correct?
23 A. Correct.
24 Q. And sir, if it turns out that Ford didn't want a
25 deployment at 90 percent of that calibration, then your

HEATHER K. NEWMAN, FOCR, RPR, CCR 774   (702)464-5828
Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
915

1  testimony that the airbag didn't deploy consistently is
2  incorrect, sir, isn't it?
3  A. It would be incorrect but then it would also explain why
4  it fails to deploy at 15 to 16 miles per hour, because they had
5  no margin, no robustness.
6  Q. Sir, to avoid anymore assumptions and speculation, why
7  don't we just wait until the Ford folks get here to explain
8  what they mean by this document.
9     Can we agree on that?
10 A. That's fine.
11 Q. Now, you agree the system was deploying the airbag
12 consistently and robustly in the 14 mile per hour pole hit for
13 the unbelted occupant.
14    True?
15 A. Yes, that is correct.
16 Q. And for the unbelted occupant, sir, the system was
17 deploying the Stage 2 bag robustly and consistently in the 23
18 mile an hour pole impact.
19    True?
Page 35

20 A. That was my recollection but I don't have -- I don't have
21 that in front of me.
22 Q. If you want to look at BUZ 37411, would that refresh your
23 recollection?
24 A. I'll trust you. Again, I didn't focus on unbelted, but I
25 do recall those being correct.

HEATHER K. NEWMAN, FOCR, RPR, CCR 774   (702)464-5828
Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
916

1  Q. And in the 14.7 pole impact and the 22.7 pole impact, the
2  pre-tensioner deploys consistently and robustly.
3     True?
4  A. Yes, it does.
5  Q. And the same components that control the airbag control
6  the pre-tensioner.
7     True?
8  A. That is correct.
9  Q. Sir, although your opinion is that this airbag system's
10 defective in all the Ford vehicle -- Ford Focus vehicles out
11 there with this system, you never told NHTSA that you think
12 these Ford Focus vehicles have a problem, have you?
13 A. I have not been able to identify the root cause. It would
14 be premature for me to go out and say that -- to NHTSA that
15 I've got a smoking gun, that this sensor was damaged in the
16 crash or some other phenomenon. I could not prove it in this
17 case because of the available information.
18 Q. Since you can't prove it, it would be premature to tell
19 NHTSA anything.
20    True?
21 A. I would not be in a position to tell NHTSA anything
Page 36

22  without the root cause.
23  Q.  And last -- in August of 2010, when you were at the owner
24  of the vehicle's home, inspecting the vehicle, you never told
25  that man his vehicle was defective, did you, sir?

            HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)464-5828
                Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
                                                                917

1   A.  I'm not sure if I even met that man but, anyway,
2   nonetheless, I didn't -- I was inspecting the vehicle at the
3   time. I had no idea what I was going to find at that time.
4   Q.  Mr. Caruso, you can't show me one specific thing that
5   wasn't working properly with this airbag system on the day of
6   the accident, can you?
7   A.  I cannot. I can only show you what is showing up in
8   Ford's documents that we've discussed in my deposition. I
9   can't tell you specifically what went wrong on this day, in
10  this vehicle, in this crash.
11  Q.  And you know that this RCM system runs diagnostics so,
12  every time someone gets in this vehicle and turns the key, it
13  checks the airbag system and it illuminates a warning light if
14  there's any problem in the system.
15          True?
16  A.  That's correct, and it continues to do those diagnostics
17  even just driving down the road.
18  Q.  It's consistently and constantly monitoring the system to
19  let the driver know that there could be a problem; right?
20  A.  We call it state of health.
21  Q.  State of health.
22          It gives you an orange or red icon on the instrument
                                 Page 37

23  panel that shows a little airbag with a driver; correct?
24  A.  That -- the icon could change from vehicle to vehicle but,
25  it lights up in what I call the airbag lamp.

            HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)464-5828
                Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
                                                                918

1   Q.  Right. We call it the airbag warning lamp.
2           True?
3   A.  Correct.
4   Q.  And you have no information whatsoever, sir, that that
5   airbag warning lamp was illuminated prior to Mr. Niemeyer's
6   crash.
7           True?
8   A.  I do not. I did go back and research documents from Hertz
9   Rent-A-Car to verify that there were no prior accidents, but I
10  have no information that would allow me to tell whether that
11  airbag light was illuminated prior to this crash.
12  Q.  You've read the Hertz representative's deposition, haven't
13  you?
14  A.  I may have. I don't remember if I read his deposition.
15  Q.  Certainly you don't have any specific information from
16  Hertz indicating that the warning light was on.
17          True?
18  A.  That is correct, I do not.
19  Q.  And have you read the investigating officer,
20  officer Tusko's deposition?
21  A.  Yes.
22  Q.  And nothing in his deposition suggesting the airbag
23  warning light was on prior to this crash.
24          True?
                                 Page 38

25  A.  That's my understanding, correct.

            HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)464-5828
                Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
                                                                919

1   Q.  So, you've testified for us, and you wrote this down with
2   Mr. Kuhlman, that the threshold is 14.7, yesterday.
3           Do you remember doing that? He was writing things
4   down and you were speaking?
5   A.  Yes.
6   Q.  And you wrote -- he wrote 14.7 based on your testimony.
7           Sir, yesterday we heard from an accident
8   reconstruction expert named Mr. Caldwell and his range was --
9   for the impact speed was 14.5 to 16 miles per hour.
10          Are you aware of that testimony?
11  A.  I thought it was 15 to 16 but, if it's 14.5 to 16, that
12  it -- if Mr. Caldwell says that, I trust his judgment.
13  Q.  Well, assume that his low end of the range is 14.5 and
14  just talking straight mathematics, sir, 14.5 is less than 14.7.
15          True?
16  A.  Correct.
17  Q.  Now, just to summarize and wrap things up, Mr. Caruso, at
18  your deposition last year you could not tell me to a reasonable
19  degree of engineering probability the exact reason why the
20  airbag in the Niemeyer vehicle did not deploy on the date of
21  the accident.
22          Is that a true statement, sir?
23  A.  In clarification, I hypothesized several areas that I hold
24  to a high degree of engineering certainty would be one of the
25  causes. I could not verify which one.
                                 Page 39

            HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)464-5828
                Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
                                                                920

1   Q.  Right.
2           You couldn't take your several probabilities and
3   narrow them down to one root cause to a reasonable degree of
4   engineering probability.
5           True?
6   A.  Correct, I could not narrow it down to one root cause with
7   reasonable engineering certainty.
8           MR. SCHUTTERT: I have nothing further. Thank you,
9   Your Honor.
10          THE COURT: All right. Anything on redirect?
11          MR. KUHLMAN: Yes, Your Honor.
12
13          REDIRECT EXAMINATION OF CHRISTOPHER CARUSO
14  BY MR. KUHLMAN:
15  Q.  Mr. Caruso, you were asked some questions about standard
16  208; correct?
17  A.  Yes.
18  Q.  Does 208 test pole tests?
19  A.  It does not.
20  Q.  Does it test tests at the threshold of must deploy levels?
21  A.  It does not. That is left to the manufacturer to verify
22  performance near threshold, and in non-frontal barrier-type
23  collisions.
24  Q.  Okay. And you were also asked questions about obviously
25  the thresholds in the 2007 Focus; correct?

            HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)464-5828
                                 Page 40

```
2012 1102 Niemeyer TT05am Caruso_K Niemeyer.txt
22         REDIRECT EXAMINATION OF KATHRYN NIEMEYER
23  BY MR. RYAN:
24  Q.  Just as a follow up, Kathryn, you nor Tony owned this 2007
25  Ford Focus; is that right?

         HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)464-5828
             Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
                                                                980

 1  A.  We did not own the Focus.
 2  Q.  Who owned it?
 3  A.  Hertz owns it.
 4         THE COURT:  Hertz owned it.
 5         MR. RYAN:  I understand.
 6  BY MR. RYAN:
 7  Q.  Who had control of it?
 8  A.  Hertz, I would assume.
 9  Q.  Did you believe that you had any control about what would
10  happen to this vehicle?
11  A.  No.
12  Q.  Do you know anything about how airbags function?
13  A.  No.
14  Q.  Are you a mechanical engineer?
15  A.  No.
16  Q.  Do you have any specific knowledge of what Mr. Jones did
17  or didn't do?
18  A.  No.
19  Q.  Did you have any understanding whether his investigation
20  in his mind was complete?
21         THE COURT:  Wait.  Let me answer that.  Are we
22  Dancing with the Stars again, where you lead us all over -- you
                                Page 97
```

```
2012 1102 Niemeyer TT05am Caruso_K Niemeyer.txt
23  lead the witness all over the courtroom?
24         MR. RYAN:  No, Judge, I'm trying to give her some
25  frame of reference for my question.

         HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)464-5828
             Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
                                                                981

 1         THE COURT:  Why don't you let her testify.  It will
 2  be so much better if you let her testify rather than you
 3  testify and have her say yes or no.
 4  BY MR. RYAN:
 5  Q.  Okay.
 6  A.  I had the inspection --
 7         THE COURT:  Wait.  Let him answer -- let him ask you
 8  a proper question.
 9         MR. RYAN:  Yeah, let me rephrase the question.
10  BY MR. RYAN:
11  Q.  Did you have any idea about what Mr. Jones intended to do?
12         THE COURT:  Let me answer that one.  Yes.  No.  What?
13  You're leading the witness again.
14         Is that not a leading question?  You look at the --
15  you look quizzically at the ceiling like that's not a leading
16  question.  Let's see, who's testifying?  You are.  Who's asking
17  for a yes or no answer?  You are.
18         MR. RYAN:  Okay.
19         THE COURT:  That's a leading question.
20         MR. RYAN:  Okay.
21  BY MR. RYAN:
22  Q.  What was Mr. Jones' intention as to his inspection?
23         MR. RODMAN:  Objection.  Calls for speculation.
24         THE COURT:  She has no way of knowing that.  That
                                Page 98
```

```
2012 1102 Niemeyer TT05am Caruso_K Niemeyer.txt
25  calls for speculation.  She didn't know what his intentions

         HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)464-5828
             Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
                                                                982

 1  were.
 2         MR. RYAN:  Okay.
 3         THE COURT:  What were his intentions about her
 4  instructions?  How would she know that?  She doesn't.
 5         MR. RYAN:  That's the point, Your Honor.  She doesn't
 6  know.  That's why I'm asking her the question.
 7         THE COURT:  Wow!
 8         That's not a proper question.  It calls for
 9  speculation.
10  BY MR. RYAN:
11  Q.  Were your intentions to withhold or prevent Ford from
12  inspecting this vehicle?
13         THE COURT:  Again, it calls for a yes or no answer.
14  You're testifying, she's not.
15  BY MR. RYAN:
16  Q.  What were your intentions in regard to the inspection?
17  A.  I was hoping to get some information for myself and my
18  family about what happened that day with that car.  It was not
19  my intention to withhold anything from Ford.  I was doing the
20  inspection -- I was having the inspection done because I was
21  asked if I wanted to have the inspection done, and not even
22  knowing what that means, based on friends' and relatives'
23  advice, I thought it best that I have it done.  I was not
24  trying to withhold anything from Ford, I was having it done for
25  my information.
                                Page 99
```

```
2012 1102 Niemeyer TT05am Caruso_K Niemeyer.txt
         HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)464-5828
             Friday, November 2, 2012 - 2:09-cv-2091-JCM-PAL
                                                                983

 1         MR. RYAN:  No other questions.
 2         THE COURT:  All right.  Thank you.
 3         Anything on recross?
 4         MR. RODMAN:  No, Your Honor.
 5         THE COURT:  Thank you, ma'am.  You may step down.
 6         THE WITNESS:  Do I leave this here?
 7         THE COURT:  Yes, ma'am, just leave it there.
 8         (Witness excused.)
 9
10     *** END OF EXCERPT OF TRANSCRIPT OF PROCEEDINGS ***
11
12
13                           * * *
14  I hereby certify that pursuant to Section 753, Title 28,
    United States Code, the foregoing is a true and correct
15  transcript of the stenographically reported proceedings held in
    the above-entitled matter.
16
17  DATED:  11-2-2012              /s/ Heather K. Newman
                                   HEATHER K. NEWMAN
18                                 U.S. Court Reporter
                                   CCR 774
19
20
21
22
23
24
25

         HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)464-5828
                                Page 100
```